UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

FCX SOLAR, LLC,                  :

                              :

               Plaintiff,        :

                              :

          v.               :

                              :

FTC SOLAR, INC.,            :

                              :

               Defendant.    :

                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## Nature of the Action

1.    Plaintiff FCX Solar, LLC ("Plaintiff" or "FCX") brings this action against defendant FTC Solar, Inc. ("Defendant" or "FTC") to require FTC to pay contractually agreed-upon royalties for FTC's sales of products designed and built using Plaintiff's intellectual property and with the assistance of Plaintiff's consulting services.

2.    Plaintiff is an engineering consultancy and green technology development firm that provides engineering services to solar power developers and develops intellectual property in the solar structures space—solutions to engineering problems that can be licensed to other companies.

3.    Defendant FTC Solar, Inc. develops and sells solar tracker systems to utilities and other large-scale producers of solar power.  A solar tracker system allows a photovoltaic cell to track the movement of the sun through the sky over the course of a day, increasing the efficiency and output of a solar array.

4.    In the fall of 2017, FTC approached Plaintiff about improving FTC's next generation of solar tracker technology.  FTC apparently believed that some of the intellectual property that Plaintiff had developed—particularly, a type of damper device that allows movable

solar arrays to withstand heavy winds—could be useful to FTC.  As negotiations continued, FTC continuously solicited information from Plaintiff under a nondisclosure agreement that, Plaintiff would learn, FTC had no intention of honoring.

5.      Having reviewed the details of Plaintiff's engineering solution, FTC retained Plaintiff for a narrow and time-limited consulting engagement.  But rather than moving forward with a broader licensing or consulting deal at that time, FTC simply began incorporating Plaintiff's design into its new line of solar trackers—without a license and without compensating Plaintiff in any way.

6.      FTC's duplicity was not revealed until September 2018, when an FCX partner happened upon FTC's booth at a trade show, featuring the new tracker, and recognized the product's damper design as the very same one that Plaintiff had developed and disclosed to FTC.

7.      When confronted with clear evidence of its wrongful use of Plaintiff's intellectual property, FTC's CEO Anthony P. Etnyre ("Etnyre") immediately acknowledged that FTC had acted wrongfully. To avoid a legal battle that he knew FTC could not win, Etnyre then offered to make things right—FTC would enter into a licensing agreement with Plaintiff after all, as well as a consulting agreement so that Plaintiff could assist FTC with integrating Plaintiff's damper technology. Etnyre represented that FTC and Plaintiff would work together to improve the finished product and would together benefit from its sales.

8.      The parties negotiated a consulting services agreement dated April 6, 2019 (the "Consulting Agreement," attached hereto as Exhibit A, with original patent appendices) and an exclusive patent license agreement dated May 13, 2019 (the "License Agreement," attached hereto as Exhibit B).  The Consulting Agreement provided Plaintiff with a modest hourly rate for its work, but reserved most of Plaintiff's compensation for the Licensing Agreement.  The

Royalty provision of the Licensing Agreement was intended to allow Plaintiff to share in FTC's success by entitling Plaintiff to a percentage of sales revenues from products sold that incorporate Plaintiff's intellectual property (calculated as a fee per watt of aggregate power generating capacity sold by FTC). This structure backloaded Plaintiff's compensation and ensured that the agreement would become more lucrative over time if—as in fact happened—Plaintiff's engineering solutions resulted in a more marketable product.

9.     With the help of Plaintiff's intellectual property and consulting work, FTC began to thrive. Its product revenue more than tripled year-over-year, from $43 million in 2019 to nearly $159 million in 2020. Between May 2019 and June 2020 FTC paid Plaintiff more than $1.4 million in royalties on these sales.

10.     Since then, FTC's business has only continued to grow. But since July of 2020, FTC has not paid Plaintiff a nickel in royalties. Apparently, FTC would rather go back to the way it used to do business—stealing and profiting off of Plaintiff's intellectual property without license or payment.

11.     FTC will soon go public, which has the potential to further boost FTC's sales and the corresponding licensing revenue due to Plaintiff. FTC has long concealed from its supporters and investors the company's absolute reliance on Plaintiff's intellectual property for the profitability of its products. Now, in a transparent effort to paper over this vulnerability on the eve of its IPO, FTC baselessly claims that it is not now (and, astonishingly and inexplicably, that it never has been) selling any products that incorporate Plaintiff's intellectual property.

12.     FTC's failure to pay Plaintiff the millions of dollars in royalties owed for Q3 and Q4 2020 and Q1 2021, as well as certain milestone payments, is a material breach of the License Agreement.

13.     Alternatively, if FTC truly believed from day one that its products did not incorporate Plaintiff's intellectual property, then it fraudulently induced Plaintiff to enter into the Consulting Agreement and the License Agreement, and thereafter falsely paid licensing fees in 2019 and 2020 with the intention of seeking their return, in order to receive engineering consulting services worth far more—services that FTC has no intention of paying for today. FTC cannot in good conscience be permitted to keep these ill-gotten gains.

14.     FTC holds itself out as a "global provider of advanced solar tracker systems" and touts its "proprietary architecture advances that lower installation cost and improve operational performance."  But the proprietary architecture advances at the heart of every solar tracker system sold by FTC are of Plaintiff's design and are sold only under license to Plaintiff.  FTC materially misleads the market, and steals from Plaintiff, every time it claims otherwise.

## The Parties

15.     Plaintiff FCX is a New Hampshire limited liability company.  The sole members of FCX are Christopher Needham ("Needham"), a natural person who is a citizen of the State of Maryland, and Frank Oudheusden ("Oudheusden"), a natural person who is a citizen of the State of New Hampshire.

16.     Defendant FTC is a corporation duly organized and existing under the laws of the State of Delaware and with its principal place of business in Austin, Texas.

## Jurisdiction and Venue

17.     There is complete diversity of citizenship between the parties.  Plaintiff FCX is a citizen of the States of New Hampshire and Maryland.  Defendant FTC is a citizen of the States of Delaware and Texas.

18.     The matter in controversy substantially exceeds the sum or value of $75,000 exclusive of interest and costs.  Defendant owes Plaintiff $135,000 in outstanding milestone

payments alone.  Defendant further holds $109 million of executed contracts and awarded

orders, all for products incorporating Plaintiff's licensed design.

19.     Defendant is subject to personal jurisdiction in the State of New York by consent.

The License Agreement provides: "The Parties hereby consent to the exclusive jurisdiction and

venue of a competent court sitting in the state of New York, for the adjudication of all matters

arising from the subject matter of this Agreement."

20.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) because

Defendant resides in this district for purposes of venue pursuant to 28 U.S.C. § 1391(c)(2). The

License Agreement provides: "The Parties hereby consent to the exclusive jurisdiction and venue

of a competent court sitting in the state of New York, for the adjudication of all matters arising

from the subject matter of this Agreement."

## Factual Allegations

### A.     FTC's Origins

21.     FTC was born from the ashes of a large publicly held solar energy firm,

SunEdison Inc. ("SunEdison").

22.     In April 2016, SunEdison filed for Chapter 11 protection.  Its stock was delisted

from the New York Stock Exchange shortly thereafter.

23.     At the time that SunEdison filed for Chapter 11 protection, its CEO was Ahmad

Chatila ("Chatila").

24.     In a Form 8-K filed on April 14, 2016, SunEdison announced that its audit

committee had concluded that there were "issues with [SunEdison's] overly optimistic culture

and its tone at the top," that management had provided the board with overly optimistic cash

forecasts, and that the company "lacked sufficient controls and processes regarding

[SunEdison's] managing of cash flows."

25.     The Wall Street Journal reported in an April 14, 2016 article that Chatila misled both the board and investors regarding SunEdison's liquidity.

26.     Former SunEdison executives, including Chatila, founded FTC in January 2017. Chatila remains a director of FTC.

27.     Upon information and belief, FTC purchased SunEdison assets, including intellectual property, out of SunEdison's bankruptcy estate.  This acquisition included SunEdison's AP90 solar tracker.

**B.     Plaintiff Discloses the Intellectual Property to FTC**

28.     On or about September 11, 2017, Needham and Oudheusden met with FTC executives at the Solar Power International Conference in Las Vegas, Nevada.  FTC executives remembered Needham and Oudheusden as talented engineers who had worked downstream at SunEdison.  At the meeting, FTC solicited from Plaintiff a proposed consulting engagement to evaluate the market for solar trackers and the competitive strength of FTC's AP90 solar tracker.

29.     On or about September 16, 2017, FTC engaged Plaintiff to conduct the market evaluation.  Plaintiff concluded its work on or about October 5, 2017.

30.     In November 2017, Plaintiff disclosed intellectual property to FTC under the protection of their continuing nondisclosure agreement concerning a patent that it was pursuing for a passive load-sharing damper that would allow significant cost-savings for solar tracker manufacturers by reducing structural steel costs.  The nondisclosure agreement is attached hereto as Exhibit C.

31.     The purpose of Plaintiff's disclosure of the intellectual property was to assist FTC in evaluating the possibility of developing a further business relationship with Plaintiff.

32.     After reviewing Plaintiff's intellectual property, FTC declined to move forward with a license or a broader consulting relationship with Plaintiff.

C.   **FTC Incorporates Plaintiff's Intellectual Property Without a License**

33.     Needham and Oudheusden attended the 2018 Solar Power International conference in Anaheim, California in September 2018 and visited FTC's booth.  In the booth, FTC was exhibiting a prototype of its successor to the AP90, the FTC Voyager Tracker.

34.     The prototype Voyager Tracker that FTC exhibited utilized Plaintiff's intellectual property—the same intellectual property that Plaintiff had disclosed to FTC in November 2017.

35.     Among other elements, the prototype Voyager Tracker that FTC exhibited utilized Plaintiff's design for a "damper," a critical component of a solar tracker which absorbs wind vibration and wind shock that can otherwise lead to damage or failure of the photovoltaic cells.

36.     At the time that FTC exhibited the prototype Voyager Tracker, Plaintiff had not yet granted FTC a license to use its intellectual property.

37.     On September 26, 2018, upon viewing the prototype Voyager Tracker, Needham and Oudheusden confronted FTC executives including Etnyre, co-founder David Springer, Mitch Bowman, Milo Zabala, and Nagendra Cherukupali regarding the unlicensed use of Plaintiff's intellectual property.

38.     During this meeting, Plaintiff and FTC agreed that the prototype Voyager Tracker included design features that "overlapped" with Plaintiff's intellectual property and that the appropriate solution would be for FTC to license the intellectual property from Plaintiff.

39.     During this meeting, Needham proposed to FTC that significant additional value could be realized if FTC fully utilized Plaintiff's intellectual property and additional knowhow.

40.     On September 28, 2018, Oudheusden memorialized the September 26, 2018 meeting in an email to Etnyre and Mitch Bowman.  The email is attached hereto as Exhibit D. *See* Exhibit D at 3.

41.     In response, Etnyre wrote: "We are largely in alignment with the summary below" and proposed the terms of a license agreement. *See id.* at 1.

42.     In his response, Etnyre never denied that the prototype Voyager Tracker incorporated Plaintiff's intellectual property.

43.     Etnyre's email was sent for the purpose of inducing Plaintiff to enter into a licensing agreement and/or a consulting agreement with FTC.

D.     **Plaintiff and FTC Enter Into the Consulting Agreement and the License Agreement**

44.     Plaintiff and FTC entered into the Consulting Agreement on April 6, 2019.

45.     In the Consulting Agreement, Plaintiff agreed to provide FTC with consulting services regarding the "continued development of the Voyager single-axis tracker platform."

46.     The Consulting Agreement set forth that Plaintiff's compensation for this work would be $190.00 per hour per individual (plus reimbursement of reasonable expenses).

47.     Plaintiff agreed to provide consulting services at such a low hourly rate because it was contemplated that Plaintiff would also be compensated through the License Agreement, including its royalty provisions.  Had FTC not been participating in good-faith negotiations regarding the License Agreement and represented that the License Agreement would include royalty payments, Plaintiff would not have entered into the Consulting Agreement.

48.     In Section 5.1 of the Consulting Agreement, FTC agreed that Plaintiff would retain and own "all right, title, and interest in and to . . . the FCX Core IP and any FCX Improvement created by FCX or [FTC] (including any FCX Improvement that is jointly created with [FTC])."

49.     The Consulting Agreement defines "FCX Core IP" to mean "all Intellectual Property conceived, developed, reduced to practice or otherwise owned by FCX prior to the

Effective Date," that is, April 6, 2019, "which, for clarity includes, the FCX damper Intellectual

Property, the Intellectual Property licensed to [FTC] as set forth in the Patent License Agreement

and wind tunnel testing techniques related to the FCX damper Intellectual Property."

50.     The Consulting Agreement defines "FCX Improvement" to mean "any invention

(whether or not patentable), improvement, modification, derivative work, or variation of any

invention, method, system, or technology pertaining to the FCX Core IP."

51.     Under the terms of Section 5.1 of the Consulting Agreement, FCX expressly

"does not grant [FTC] rights to use the FCX Core FCX Core IP or FCX Improvement . . . as any

rights are provided under the [License Agreement]."

52.     Section 9.3 of the Consulting Agreement provides that FTC's agreement

regarding Plaintiff's ownership of FCX Core IP and FCX Improvements in Section 5.1 of the

Consulting Agreement will survive any termination or expiration of the Consulting Agreement.

53.     Plaintiff and FTC entered into the License Agreement on May 13, 2019.

54.     In the License Agreement, Plaintiff granted FTC a royalty-bearing license to

make and sell Products.

55.     Section 1.8 of the License Agreement defines Product to mean, "on a country-by-

country basis, any product the making, using, selling, offering for sale, importing or exporting in

the country in question would (without the license granted hereunder) infringe directly indirectly

by inducement of infringement, or indirectly by contributory infringement, at least one issued

Valid Claim or any pending Patent claim that would be hypothetically infringed if such pending

claim were issued in its then pending state, in such country."

56.     Section 1.13 of the License Agreement defines Valid Claim to mean, "(a) a claim

of an issued and unexpired Patent that has not been abandoned, revoked, or held unenforceable

or invalid in a decision from which an appeal cannot be taken; or (b) a claim in any pending

application for a Patent that was filed in good faith and has not been cancelled, withdrawn,

abandoned, or finally disallowed without the possibility of appeal or refiling of such application

and has not been pending for more than five years."

57.     The contractual definition of Product thus includes not just products that utilize

Plaintiff's issued patents, but also products that fall within any Patent claim pending at any time

in any of Plaintiff's patent applications.

58.     Section 1.12 of the License Agreement defines "Solar Tracker" to mean a

"device, installed at grade, incorporating the Product that uses a single-axis for orienting Solar

Panels."

59.     At the time Plaintiff and FTC entered into the License Agreement, exemplary

claims pending in Plaintiff's family of patent applications had already been disclosed to FTC.

Exhibit A at 27, 56–59.

60.     Those claims covered products with dampers that "passively transition" from "a

first damping ratio when the collection of photovoltaic modules moves at a first rate relative to

the base" to "a second damping ratio when the collection of photovoltaic modules moves at a

second rate relative to the base." *Id.* at 56.

61.     Those claims separately covered products with dampers "having a first damping

ratio when the actuator moves the photovoltaic modules and passively transitioning to a second

damping ratio that is greater than the first damping ratio when environmental loads are applied to

the photovoltaic modules." *Id.* at 58.

62.     FTC's Voyager product was covered by these claims on the day the License

Agreement was signed.

63.     FTC's Voyager product has been covered by these claims at all times since the License Agreement was signed.

64.     On information and belief, all damper-containing products made, used, sold, and offered for sale by FTC since the License Agreement was signed have been covered by these claims.

65.     FTC's products are also covered by other claims pending in Plaintiff's family of patent applications on the day the License Agreement was signed.

66.     FTC's products are also covered by, for example, later claims in Plaintiff's family of patent applications, such as claims with dampers having "a damper piston movable through the fluid inside the damper chamber," where the piston includes "a first port," "a second port," and "a valve, configured to passively open or close the second port." *See* U.S. Patent Application No. 16/443,535, Amendment of 06/16/2020.

67.     Plaintiff has regularly informed FTC as to its patent filings.

68.     Section 10.1 of the License Agreement provides that, unless the parties terminate the License Agreement, FTC's obligations under the License Agreement (including its payment obligations) will continue "until the expiration of all Patents (if any) and the cancellation, withdrawal, or express abandonment of all pending patent applications under the Patents (if any)."

69.     The License Agreement provides that Plaintiff will be compensated both by non-refundable milestone payments and by the payment of royalties.

70.     Section 3.1 of the License Agreement requires FTC to make the following Milestone Payments:  (a) $15,000 due within 30 days of the effective date; (b) $60,000 due within 30 days of FTC first including a device design in the bill of materials for a Solar Tracker

11

that can be quoted by or ordered commercially from FTC or an affiliate; (c) $75,000 due within thirty days after FTC receives the first purchase order for the sale of a Solar Tracker; and (d) $50,000 due within 30 days after the first Patent issues with a Valid Claim covering a device or process for use in or with a Solar Tracker.

71.     Section 3.2 of the License Agreement requires FTC to pay royalties of $0.0015 per watt (direct current) for the first two "cumulative gigawatts of the designed DC output wattage of Solar Panels designed to be controlled by any Solar Tracker Sold by" FTC or an affiliate.

72.     After the first $3 million of royalties, the royalty per watt of output wattage declines to $0.00125 for the third cumulative gigawatt and $0.0010 per watt for watts in excess of the third cumulative gigawatt.

73.     FTC is required to pay royalties within thirty days after the end of each calendar quarter.

74.     In Section 3.5 of the License Agreement, FTC agreed to pay interest on unpaid principal of any late payments at the rate of 1.5%, compounded monthly.

75.     Section 3.3(a) of the License Agreement provides Plaintiff with the option to terminate the License Agreement early if the royalties under the agreement fall below specified minimum fees, unless FTC makes a shortfall payment to cover the difference.

76.     The amount of the minimum fee increases each year because the parties contemplated that the business would grow and that Plaintiff's compensation would increase over the life of the License Agreement.

77.     Section 4.1 of the License Agreement required FTC to provide a "true and accurate" sales report at the end of each quarter identifying all sales of Products and Solar Trackers under the License Agreement for which royalty payments have become payable.

**E.     FTC Sold and Continues to Sell Products That, Without a License, Would Infringe Plaintiff's Issued and Past Pending Patent Claims**

78.     Since executing the Consulting Agreement and License Agreement, continuous to the present day, FTC has sold products that fall within Section 1.8 of the License Agreement.

79.     Since executing the Consulting Agreement and License Agreement, continuous to the present day, FTC has sold products that fall within Section 1.12 of the License Agreement.

80.     FTC has sold products with dampers that "passively transition" from "a first damping ratio when the collection of photovoltaic modules moves at a first rate relative to the base" to "a second damping ratio when the collection of photovoltaic modules moves at a second rate relative to the base," and that otherwise met all limitations of Claim 1 accompanying the Consulting Agreement. Exhibit A at 56.

81.     FTC has performed dynamic modeling of its products evidencing this behavior in its dampers.

82.     FTC has also sold products with dampers "having a first damping ratio when the actuator moves the photovoltaic modules and passively transitioning to a second damping ratio that is greater than the first damping ratio when environmental loads are applied to the photovoltaic modules," and that otherwise met all limitations of Claim 12 accompanying the Consulting Agreement. *Id.* at 58.

83.     FTC has performed dynamic modeling of its products evidencing this behavior in its dampers.

84.     FTC has also sold products with dampers having "a damper piston movable through the fluid inside the damper chamber," where the piston includes "a first port," "a second port," and "a valve, configured to passively open or close the second port" and that otherwise met all limitations of Claim 1 added to Plaintiffs' patent application 16/443,535 on June 16, 2020. *See* U.S. Patent Application No. 16/443,535, Amendment of 06/16/2020.

85.     Since July of 2020 or earlier FTC is believed to have used dampers with a first port, a second port, and a valve configured to passively open or close the second port.

F.     **FTC Initially Performs Under the License Agreement to Obtain Consulting Services of FCX**

86.     FTC initially performed under the License Agreement, paying Plaintiff license royalties as follows.

87.     For Q3 of 2019, FTC paid Plaintiff $158,145 in license royalties.

88.     For Q4 of 2019, FTC paid Plaintiff $380,580 in license royalties.

89.     For Q1 of 2020, FTC paid Plaintiff $320,318.28 in license royalties.

90.     For Q2 of 2020, FTC paid Plaintiff $610,350 in license royalties.

91.     FTC's paid royalties reflected FTC's correct understanding that its Voyager product, and any other damper-containing products, fell within Section 1.8 and Section 1.12 of the License Agreement from the day the License Agreement was signed.

92.     FTC's license royalties—and pledged future royalties—also reflected the high value of Plaintiff's consulting services, as provided by Needham and Oudheusden.

93.     From May 13, 2019 through the present day, FTC has relied on Plaintiff's consulting services, knowhow, and intellectual property to refine FTC's products and thereby secure greater product sales.

94.     When the License Agreement was signed, FTC's products were suspected to be at high risk of failure in wind conditions.

95.     FTC thereafter began modifying its products in accordance with Plaintiff's guidance and intellectual property. Subsequent test results indicated that FTC's products, so modified, could satisfy project design wind speeds, although at a significant cost premium.

96.     FTC appreciated that its products would not be safe and viable unless Plaintiff could teach FTC to refine its products to meet exacting industry standards. To this end, Plaintiff was integral in advising and overseeing a second round of aeroelastic testing. Plaintiff worked extensively with FTC staff and external engineers to implement new methods to make FTC's projects code-compliant, resulting in increased FTC revenues in 2020. Plaintiff also taught further changes to the Voyager product lines that resulted in substantial increases in product reliability. These changes were implemented in early 2021.

97.     Plaintiff has performed at least 697 hours of work for FTC. During this time, Plaintiff was instrumental in solving time-sensitive product and project issues.

98.     Plaintiff first identified critical information that had not been previously evaluated in the Voyager product and spent significant time inventing and then implementing a method of modeling the behavior of the Voyager solar tracker under various wind loading scenarios.

99.     FTC used Plaintiff's modeling method to assure its customers that the Voyager system was safe.

100.    Plaintiff was also instrumental in the design and interpretation of aeroelastic tests FTC ran to further validate FTC's design.

101.    Plaintiff also proposed product changes to better implement Plaintiff's Core IP to reduced design loading and product costs significantly.  Without these product changes, FTC

would not have achieved the project volumes it did in 2020 and 2021 and would not be able to achieve the project volumes it projects today.  It also may have found itself subject to liability to its existing customers for failing to deliver a solar tracker that met the required specifications, a potentially devastating blow to a growing startup.

102.    Plaintiff's engagement facilitated at least $100,000,000 in revenue to FTC.

103.    During the pendency of its consulting relationship with FTC, Plaintiff also forewent consulting opportunities with other clients, both because of the conflict posed by the ongoing engagement by FTC and because the time that Plaintiff spent on the FTC work prevented Plaintiff from taking on additional work.

**G.    FTC Stops Performing Under the License Agreement**

104.    FTC failed to make a $60,000 milestone payment to Plaintiff within 30 days after the date that FTC first included a device design in the bill of materials for a Solar Tracker that can be quoted by or ordered commercially from FTC, as required by Section 3.1(b) of the License Agreement.  This payment should have been made no later than May 1, 2020.

105.    FTC failed to make a $75,000 milestone payment to Plaintiff within 30 days after the date that FTC first received a purchase order for the sale of a Solar Tracker, as required by Section 3.1(c) of the License Agreement.  This payment should have been made no later than May 1, 2020.

106.    On or about October 20, 2020, FTC transmitted the Q3 2020 Sales Report to Plaintiff.  The Q3 2020 Sales Report purported to deduct $243,000 in royalties that had been paid to Plaintiff in Q2 2020 in connection with a project ("Project A").

107.    In a phone call, Etnyre told Oudheusden that it was FTC's position that the royalty should not have been paid for Project A because the solar array installed in Project A added an ancillary mechanism to the tracker.

16

108.    FTC thereafter reiterated its belief that it was entitled to use Plaintiff's damper technology without paying a royalty under the License Agreement so long as the tracker also used an added mechanism.

109.    At no point did FTC represent that the tracker sold in Project A did not use Plaintiff's damper technology.

110.    Having failed to make required milestone payments and having staked out a position that it was entitled to continue utilizing Plaintiff's intellectual property without a license, FTC continued to walk away from its other obligations under the License Agreement.

111.    FTC failed to deliver Sales Reports to Plaintiff 30 days after the close of Q4 2020 and Q1 2021 as required in Section 4.1 of the License Agreement.

112.    These Sales Reports are necessary for Plaintiff to be able to calculate the royalties owed under the License Agreement and to know whether FTC has fully paid all such royalties.

113.    Even without such Sales Reports, it is beyond dispute that FTC has not paid the royalties due under the License Agreement because FTC has not paid any royalties whatsoever for Q3 2020, Q4 2020, or Q1 2021.

114.    FTC's Q3 2020 Sales Report stated that FTC owes Plaintiff $547,350 in royalties for Q3 2020.

115.    FTC has not paid Plaintiff any of the royalties identified in the Q3 2020 Sales Report.

116.    Upon information and belief, FTC owes Plaintiff no less than a further $750,000 in royalties for Q4 2020 and $750,000 in royalties for Q1 2021 (and based on FTC's public disclosures likely more), although without the contractually required Sales Reports the total royalty amounts due cannot be determined with complete certainty.

117.     Pursuant to Section 3.5 of the License Agreement, FTC must also pay Plaintiff interest at a rate of 1.5% compounded monthly on the unpaid principal of each missed milestone and royalty payment.

118.     Based on market growth rates and success predictions consistent with FTC's public disclosures, projected sales of FTC's products through 2041 would result in over $100,000,000 in royalties due to Plaintiff.

119.     Despite FTC's bad faith attempts to profit off of Plaintiff's intellectual property without compensation, Plaintiff continued to perform under the Consulting Agreement.

**H.     FTC Further Repudiates the License Agreement**

120.     Having already made the claim that FTC was entitled to continue utilizing Plaintiff's damper technology without paying royalties on future projects so long as those future projects incorporate its ancillary mechanism, FTC went several steps further and claimed that—despite all evidence to the contrary—FTC had never utilized Plaintiff's intellectual property. This astonishing reversal, if taken seriously, would render many of FTC's past statements materially false and misleading.

121.     On December 23, 2020, Jacob Wolf, the general counsel of FTC, sent a letter to Plaintiff, attached hereto as Exhibit E with potentially confidential information of FTC redacted (the "December 2020 Letter").

122.     In the December 2020 Letter, FTC claimed that it had retained outside counsel to investigate whether it was required to pay Plaintiff, among other things, the royalties that FTC had already identified in the Q3 2020 Sales Report as due and owing to Plaintiff.

123.     According to FTC, its outside counsel concluded that FTC "has not incorporated dampers that would infringe any issued claim of the '231 patent or '097 patent into any of its

Voyager Tracker systems, and, accordingly, does not owe FCX any milestone, royalty, or late payments." Exhibit E at 1.

124.    FTC further suggested that Plaintiff should return the more than $1.4 million in royalty payments that FTC had already voluntarily paid to Plaintiff, on the basis of Sales Reports provided by FTC. *Id.* at 1-2.

125.    For the reasons stated in Paragraphs 59 to 66 and 78 to 85 of this Complaint, FTC's claim is entirely baseless.

126.    FTC's outside counsel cannot have had greater insight than FTC's executives and engineers regarding the intellectual property utilized by the Voyager Tracker.

127.    At the time that FTC was negotiating the License Agreement and Consulting Agreement with Plaintiff, FTC knew that the Voyager Tracker utilized Plaintiff's intellectual property.

128.    As FTC worked closely with Plaintiff for nearly two years to develop and refine the Voyager Tracker, FTC knew that it was incorporating FTC intellectual property and FTC improvements into that design.

129.    If FTC is correct that the Voyager Tracker never utilized Plaintiff's intellectual property, it must follow that FTC has been engaged in a multi-year campaign of deceit against Plaintiff.

130.    If FTC is correct that the Voyager Tracker never utilized Plaintiff's intellectual property, then Etnyre's October 19, 2018 statement that FTC was "largely in alignment with the summary below," which summary stated that FTC and Plaintiff "agreed that overlap [of intellectual property] existed" between Plaintiff and the Voyager Tracker design, was materially false or misleading.

131.    If FTC is correct that the Voyager Tracker never utilized Plaintiff's intellectual property, then each of the Q3 2019, Q4 2019, Q1 2020, Q2 2020, and Q3 2020 Sales Reports was materially false or misleading.

132.    If FTC is correct that the Voyager Tracker never utilized Plaintiff's intellectual property, then FTC made materially false or misleading statements, to induce Plaintiff into entering the Consulting Agreement and agreeing to provide cut-rate consulting services to FTC, and thereafter to induce Plaintiff to continue providing these services.

133.    Had FTC at any time shown that it believed Voyager was not a Product or a Solar Tracker within the definition of the License Agreement, or had FTC at any time shown that it did not intend to make any royalty payments or milestone payments under the License Agreement on Voyager, Plaintiff would not have entered into the Consulting Agreement and would not have provided FTC with nearly 700 hours of consulting services directed to Voyager.

**First Claim for Relief**
**(Breach of Contract)**

134.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 133.

135.    The License Agreement was a contract between Plaintiff and FTC.  Plaintiff performed under the License Agreement by granting the license.

136.    FTC breached its obligations under the License Agreement by failing to timely pay required milestone payments, royalty payments, and late payments.

137.    As a result of FTC's breach, Plaintiff is owed, and has suffered damages, in an amount to be determined at trial.

**Second Claim for Relief**
**(Fraud)**

138.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 137.

139.    Etnyre and FTC represented to Plaintiff on September 26, 2018 and again on October 19, 2018 that FTC agreed with Plaintiff that the Voyager Tracker design used intellectual property that overlapped with the intellectual property previously disclosed by Plaintiff to FTC, and that FTC would require a license in order to continue using the design.

140.    This statement was materially false or misleading if, as follows from the statements in FTC's December 23, 2020 letter, at the time that the statement was made FTC maintained a secret belief that the Voyager Tracker did not utilize any infringing intellectual property and that FTC could continue to produce and sell the Voyager Tracker without a license.

141.    Etnyre and FTC knew that these statements were false at the time that they were made.

142.    Etnyre and FTC made these statements for the purpose of inducing Plaintiff to enter into the Consulting Agreement and intended Plaintiff to rely upon them.  FTC wanted to obtain the benefits of FTC's consulting services without providing adequate compensation.

143.    Plaintiff justifiably relied upon Etnyre and FTC's false statements in agreeing to the Consulting Agreement, including its cut-rate hourly fees.  Plaintiff, through the exercise of due diligence, could not have learned about the falsity of FTC's statement regarding FTC's secretly held belief prior to entering into the Consulting Agreement.

144.    As a result of FTC's false statements, Plaintiff is owed, and has suffered damages, in an amount to be determined at trial.

145.    Plaintiff is owed no less than the value of Plaintiff's lost opportunity to apply its consulting services to other clients.

146.    Plaintiff is further owed no less than the value of the improvements that Plaintiff's labor has provided, and is expected to provide, to FTC's products and sales.

**Third Claim for Relief**
**(Unjust Enrichment)**

147.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 146.

148.    FTC was enriched by Plaintiff's provision of consulting services.  Its revenues were substantially enhanced as a direct result of the intellectual property and know-how contributed by Plaintiff.

149.    FTC's enrichment was at Plaintiff's expense.  Plaintiff at all times understood, and believed that FTC agreed, that Plaintiff's primary compensation for the consulting services delivered under the Consulting Agreement would come from royalties under the License Agreement.  Plaintiff would not have entered into the Consulting Agreement and provided FTC with nearly 700 hours of consulting services at a grossly inadequate hourly rates if Plaintiff had been aware that FTC intended to repudiate the License Agreement.  Rather, Plaintiff would only have entered into a consulting agreement under Plaintiff's typical fee structure of a percentage of costs saved or value added on a per-sale or per-watt basis.

150.    The value of the benefits that Plaintiff conferred upon FTC far exceed FTC's payment under the Consulting Agreement alone.  If FTC is correct that the License Agreement was never required and that it does not owe Plaintiff any money under the License Agreement, then it would be grossly unjust and inequitable to allow FTC to retain the value of Plaintiff's consulting services without providing adequate compensation.

151.    The inequity arises from FTC's asymmetric knowledge of its technology and its plans for the future.  FTC either knew or should have known that it did not intend to sell products that fell under the License Agreement.

152.    FTC has thus been unjustly enriched, and Plaintiff is owed, and has suffered damages, in an amount to be determined at trial.

22

153.     Plaintiff is owed no less than the true value of the consulting services that it provided to FTC which may be measured, among other ways, by the value of the improvements that Plaintiff's labor has provided, and is expected to provide, to FTC's products and sales.

## **Prayer for Relief**

WHEREFORE, Plaintiff requests the entry of judgment against Defendant as follows:

(a)     Awarding Plaintiff damages in an amount to be determined at trial, but no less than $133,818,129 together with pre-judgment interest and post-judgment interest, as applicable;

(b)     Awarding Plaintiff its costs and expenses of collection for all unpaid milestone payments and royalty payments, including but not limited to Plaintiff's attorneys' fees; and

(c)     Granting Plaintiff such other legal and equitable relief as the Court deems just and proper.

Dated: April 21, 2021                    Respectfully submitted,

**PERKINS COIE LLP**

*/s/ Matthew J. Moffa*
Gene W. Lee
Matthew J. Moffa
Andrew Podolin
Jacob Taber
PERKINS COIE LLP
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036-2711
Telephone: (212) 261-6857
Fax: (212) 399-8057
e-mail: MMoffa@PerkinsCoie.com

Brian Coleman (*pro hac vice* forthcoming)
James F. Valentine (*pro hac vice* forthcoming)
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304-1212
Telephone: (650) 838-4300
Fax: (650) 838-4350
e-mail: BColeman@PerkinsCoie.com

*Counsel for Plaintiff FCX Solar, LLC*