# Exhibit B

Final 13 May 2019
Confidential

# PATENT LICENSE AGREEMENT

This Patent License Agreement (this "***Agreement***") is effective 13 May, 2019 ("***Effective Date***") by and between FCX Solar, LLC a New Hampshire Limited Liability Company ("***FCX***"), and FTC Solar Inc., a Delaware corporation having its principal place of business at 11801 Domain Blvd., 3rd Floor, Austin, Texas, 78758 ("***Licensee***"). FCX and Licensee are collectively referred to as the "***Parties***" and individually as "***Party***". For good and valuable consideration, the sufficiency of which is hereby acknowledged by each Party, the Parties hereby agree as follows:

## SECTION 1
## CERTAIN DEFINITIONS

As used in this Agreement, the terms with initial capitalized letters, whether used in the singular or plural form, will have the meanings set forth in this <u>Section 1</u> or, if not listed below, the meaning designated in places throughout this Agreement.

1.1   "***Affiliate***" means, with respect to any Person, any Person that now or hereafter directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person, or entity, but only for so long as and during the period that such Control exists.

1.2   "***Change of Control***" means any transaction or series of transactions, including any such transactions in bankruptcy, in which a Person or entity or group of related Persons or entities who do not Control the subject entity before such transaction or series of transactions, subsequently obtains Control of the subject entity by any means, whether by operation of law, merger, acquisition of securities, contract, acquisition of assets or otherwise.

1.3   "***Control***" means: (a) ownership of more than fifty percent (50%) of the outstanding stock or securities entitled to vote for the election of directors or similar managing authority of the subject entity; (b) ownership of more than fifty percent (50%) of the ownership interest that represents the right to make decisions for the subject entity; (c) any other ability to elect more than fifty percent (50%) of the board of directors or similar managing authority of the subject entity, whether by contract or otherwise; or, (d) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the subject entity whether through the ownership of voting securities, though other voting rights, by contract or otherwise.

1.4   "***Fees***" means, collectively, the Royalties, Milestone Payments, and any Shortfall Payments and other amounts required to be paid to FCX pursuant to this Agreement.

1.5   "***Patent(s)***" means, individually and collectively, the patent applications set forth on Exhibit A, as well as any patents or other registrations issuing therefrom and any continuation, divisional, reissue, renewal, or extension, in whole or in part, of any such application or registration, and any international counterparts.

1.6   "***Patent Challenge***" means any act by Licensee or its Affiliates, directly (including, by itself or through an agent) or indirectly (including, through a "straw man," or other involvement for or with another Person, or otherwise), challenging the scope, validity, enforceability, ownership, or inventorship of a Patent, whether pursuant to a court action, reexamination, opposition, patent office proceeding or otherwise. However, "Patent Challenge" will not include compliance with subpoenas or other court orders, provided that (and only to the extent): (i) Licensee or its Affiliates have not directly or indirectly encouraged the issuance of such order or subpoena and (ii) such compliance is required by law.

Final 13 May 2019
Confidential

1.7   **"*Person*"** means any individual, corporation, limited liability company, partnership, joint venture, trust, business, association or other entity.

1.8   **"*Product*"** means on a country-by-country basis, any product the making, using, selling, offering for sale, importing or exporting in the country in question would (without the license granted hereunder) infringe directly, indirectly by inducement of infringement, or indirectly by contributory infringement, at least one issued Valid Claim or any pending Patent claim that would be hypothetically infringed if such pending claim were issued in its then pending state, in such country.

1.9   **"*Royalty Term*"** means, on a country-by-country basis, the period commencing with the first commercial Sale of a Solar Tracker and ending upon the earlier of (i) the expiration of the Term and (ii) the expiration of the last Valid Claim of the Patent.

1.10   **"*Sell, Sale or Sold*"** means any sale, transfer or other disposition of Products for which consideration is received by Licensee, or its Affiliates. A Product will be deemed to be Sold upon the earlier of (i) Licensee or its Affiliates receiving: (a) the final payment for such Product or (b) any consideration for such Product that includes any profit margin for Licensee or (ii) the initial generation of power from the Solar Panels to which the Solar Tracker (incorporated into such Product) is attached. Sales and other transfers between or among Licensee and its Affiliates will be excluded from Sales and no Royalties or other Fees will be payable on such sales and other transfers, except where such Affiliates are end users of the Products; and, if such Affiliates are not end users of the Products then, the Sale of the Products, will be deemed completed upon the Affiliates first receipt of any consideration for such Products from a third party that is not an Affiliate of Licensee. If the Products are used by the Licensee or its Affiliates for their own use, the Sale of any such Products will be deemed to occur upon the initial generation of power from the Solar Panels to which the Solar Tracker (incorporated into such Product) is attached.

1.11   **"*Solar Panels*"** means solar panels (including photovoltaic panels), parabolic troughs, fresnsl reflectors, lenses, mirrors or any other device that reflects, focuses, concentrates or otherwise converts energy from the sun.

1.12   **"*Solar Tracker*"** means a device, installed at grade, incorporating the Product that uses a single-axis for orienting Solar Panels.

1.13   **"*Valid Claim*"** means (a) a claim of an issued and unexpired Patent that has not been abandoned, revoked, or held unenforceable or invalid in a decision from which an appeal cannot be taken; or (b) a claim in any pending application for a Patent that was filed in good faith and has not been cancelled, withdrawn, abandoned, or finally disallowed without the possibility of appeal or refiling of such application and has not been pending for more than five years.

## SECTION 2
## LICENSES

2.1   <u>Grant of Licenses.</u>   FCX hereby grants to Licensee a world-wide, royalty-bearing during the Royalty Term as provided herein, exclusive (subject to <u>Section 2.2</u>) non-transferrable (except as provided in <u>Section 11.4</u>) right, with no right to grant sublicense, under the Patents during the Term: (a) to make and have made Products; and (b) to sell, offer for sale, export and import Products that are incorporated into Solar Trackers; and (c) use the Products that are incorporated into Solar Trackers and to authorize Affiliates to use such therefore.

2.2   <u>Retained Rights.</u>   Notwithstanding anything to the contrary in this Agreement, FCX retains:

Final 13 May 2019
Confidential

(a) the right to conduct solely research or development activities for the Products at any time (but not commercialization of Products in Solar Trackers); (b) the right to make, or have made, sell and offer to sell Products solely for use in devices other than Solar Trackers, such as devices for orienting Solar Panels that are either not installed at grade or that utilize a multiple-axis or other non-single axis mechanism for orienting Solar Panels; or, (c) in each case, to authorize others to do any of the foregoing.

2.3    No Implied Rights.  Except for the licenses granted to Licensee in Section 2.1, FCX retains all rights, title and interest in and to all Patents and other intellectual property; and reserves all rights not expressly granted to Licensee hereunder; and, no other rights are granted to Licensee by implication, estoppel, statute, operation of law or otherwise.

## SECTION 3
## COMPENSATION

3.1    Milestone Payments.  Licensee will pay FCX the following non-refundable milestone payments (collectively the "*Milestone Payments*"):

(a)    Licensee will pay FCX $15,000 due (without invoice) within thirty (30) days after the Effective Date;

(b)    Licensee will pay FCX $60,000 due (without invoice) within thirty (30) days after that date Licensee or any Affiliate first includes a device design in the bill of materials for a Solar Tracker that can be quoted by or ordered commercially from Licensee or any of its Affiliates that occurs after the Effective Date;

(c)    Licensee will pay FCX $75,000 due (without invoice) within thirty (30) days after the date the first purchase order after the Effective Date for the Sale of a Solar Tracker is received by Licensee or any of its Affiliates;

(d)    Licensee will pay FCX $50,000 due (30 days following the receipt of an invoice from FCX indicating that the first Patent has issued) when the first Patent issues with a Valid Claim covering a device or process for use in or with a Solar Tracker;

3.2    Royalties.  The following fee computations have been agreed to as a mutually preferable accounting convenience for the mutual benefit of the Parties to minimize or avoid administrative burdens. Accordingly, the Royalty (defined below) computations in this Agreement will not be construed as constituting any attempt by FCX to impose any royalty on any device that does not practice the claims of the Patents or which do not otherwise require a license.  Thus, the Royalties are intended to produce a mutually acceptable total payment that is comparable to the amounts Licensee would pay FCX had the payments been calculated based on the Sale of Products.  Commencing with the first commercial Sale by Licensee or its Affiliates of a Product after the Effective Date, and continuing until the end of the Royalty Term, License will pay FCX the following amounts on Sales of Solar Trackers by Licensee or its Affiliates (whichever Sale occurs first) ("*Royalty(ies)*") within thirty (30) days after the end of each calendar quarter (each such calendar quarter a "*Reporting Period*") (except that no Royalty payments will accrue or be due under this Section 3.2(a) with respect to the first 66 million watts ("*MW*") of the designed DC output wattage of Solar Panels designed to be controlled by any Solar Tracker Sold by Licensee or any of its Affiliates after the Effective Date) as follows:

(a)    $0.0015 per watt (direct current ("*DC*")) for the first two (2) cumulative gigawatts of the designed DC output wattage of Solar Panels designed to be controlled by any Solar Tracker Sold by Licensee or any of its Affiliate.

3

(b)     $0.00125 per watt (DC) for the third (3rd) cumulative gigawatt of the designed DC output wattage of Solar Panels designed to be controlled by any Solar Tracker Sold by Licensee or any of its Affiliates;

(c)     $0.0010 per watt (DC) in excess of the third (3rd) cumulative gigawatt of the designed DC output wattage of Solar Panels designed to be controlled by any Solar Tracker Sold by Licensee or any of its Affiliates;

(d)     In the event Licensee initiates a Patent Challenge, to the maximum extent permitted by applicable law, the Royalties payable under Section 3.2 will be increased by two-hundred percent (200%) (or such lesser percentage that FCX may determine in its sole discretion) for the remainder of the Term.

3.3     Minimum Payments.

(a)     Subject to Section 3.3(b) below, with respect to each year during the Royalty Term, this Agreement (including the license granted to Licensee in Section 2.1) will automatically terminate in the event Licensee fails to pay FCX Fees under Section 3.2 for the calendar year identified in the Table 1 below ("*Applicable Period*") that equal or exceed the corresponding minimum wattage amounts identified in Table 1 below (such amounts, the "*Minimum Fees*"), and fails to cure such shortfall by paying an amount equal to the shortfall within thirty (30) days after the end of such calendar year. Licensee has the right, but not the obligation, to cure any such shortfall (thus maintaining exclusivity) by paying FCX, on or prior to the date thirty (30) days after the last payment is due for such Applicable Period, an amount equal to the amount of such shortfall (a "*Shortfall Amount*").

| Table 1 | |
|---|---|
| **Calendar Year** | **Minimum Annual Volumes** |
| 2019 | 15 MW |
| 2020 | 50 MW |
| 2021 | 150 MW |
| 2022 | 250 MW |
| Each Calendar year thereafter | 500 MW |

(b)     Notwithstanding 3.3(a), any Milestone Payments that have been paid hereunder, regardless of the year in which such Milestone Payments were paid until such time as 66 MW of the designed DC output wattage of Solar Panels designed to be controlled by any Solar Tracker are Sold by Licensee or any of its Affiliates after the Effective Date, will offset any Shortfall Amounts required to be paid pursuant to Section 3.3(a) in order to retain exclusivity.

3.4     Payments. All payments due under this Agreement will be drawn on a United States bank and will be payable in United States dollars via wire transfer to an account in the United States designated by FCX without deductions for taxes, assessments, fees, or charges of any kind.

3.5     Late Payment. If any undisputed Fees due from Licensee under this Agreement are not timely paid for any reason, Licensee will pay FCX interest on the unpaid principal amount from and after the date on which the same became due at a rate of 1.5%, compounded monthly, or the maximum amount

Final 13 May 2019
Confidential

allowed by law, whichever is less. Licensee will promptly pay all of FCX's costs and expenses of collection for any Fees that are not timely paid, including any attorneys' fees or other costs or expenses of collection.

3.6     No Right to Set-Off.   Except as set forth in <u>Section 3.3(b)</u> above: the obligation of Licensee to pay the undisputed Fees accrued hereunder is absolute, notwithstanding any claim that Licensee may assert against FCX; and, Licensee will not set-off, compensate or make any deduction from payments of undisputed Fees for any reason whatsoever.

**SECTION 4**
**REPORTS AND RECORDS**

4.1     <u>Sales Reports.</u>   Contemporaneously with the payments made pursuant to <u>Section 3.2,</u> and commencing with the first commercial Sale of Product, Licensee will deliver to FCX a true and accurate report, certified by an officer of Licensee, giving such particulars of Sales by Licensee and its Affiliates (including copies of reports of Sales provided by Affiliates to Licensee) during the applicable Reporting Period under this Agreement as necessary for FCX to account for Licensee's payments, including royalties, hereunder, even if no payments are due.  Receipt or acceptance by FCX of any report or of any sums paid by Licensee, will not preclude FCX from questioning or auditing the completeness or accuracy of such statement or payment at any time. Licensee will include the following information in the report:

(a)     The period covered by the report;

(b)     The name of any Affiliates whose activities are also covered by the report;

(c)     Identification of each type of Product and Solar Tracker for which any Royalty payments have become payable;

(d)     Sales segregated on a product-by-product, and a country-by-country basis, or an affirmative statement that no Sales were made.

(e)     Any changes in accounting methodologies used to account for and calculate the items included in the report since the previous report.

4.2     <u>Records.</u>   Licensee will keep, and will cause its Affiliates to keep, complete and accurate records of their Sales and other information relating to such Sales reasonably requested by FCX in sufficient detail to enable the payments made under this Agreement to be determined and audited for a period of seven years after the applicable Reporting Period. Licensee will timely provide to FCX any tax documents (such as form 1099) as required by law or reasonably requested by FCX from time to time.

4.3     <u>Audit Rights.</u>   Licensee will make its (and its applicable Affiliates) books and records directly (and solely to the extent) related to the verification of the payments hereunder or Licensee's compliance with its obligations under this Agreement available for inspection, copying, and audit by an independent third party accounting firm selected by FCX and reasonably acceptable to Licensee during normal business hours, upon not less than five (5) business days advance notice, and no more than once annually. Such audit will be made by FCX at its own expense, except as provided below. Licensee will reasonably cooperate in connection with such audit, including by making available qualified employees and agents reasonably available to answer questions pertaining to such audit. If any amounts owed to FCX have been underpaid, then Licensee will immediately pay FCX the amount of such underpayment plus accrued

5

**5**

Final 13 May 2019
Confidential

interest due in accordance with <u>Section 3.5.</u> If an audit reveals that there is an error in the payment of any Royalties with respect to the period being audited in excess of the lesser of US$25,000 or five percent (5%) of the Royalties for any Reporting Period, then without prejudice to any other amounts due to FCX or to any of its rights hereunder, the cost paid for the third party auditor in connection with such inspection and audit will be borne and promptly paid by Licensee.

**SECTION 5**
**MARKING AND COMPLIANCE**

5.1     <u>Patent Markings.</u>  Licensee will ensure that all Products Sold by Licensee or its Affiliates are legibly marked with the number of any applicable Patent(s) licensed hereunder in accordance with each country's patent marking laws, including Title 35, U.S. Code.

5.2     <u>Governmental Approvals and Marketing of Products.</u> As between the Parties, (a) Licensee will obtain and maintain all necessary governmental approvals for the development, production, distribution, Sale, and use of any Product, at Licensee's expense, including, any safety studies and (b) Licensee will have sole responsibility for the operation, maintenance, and quality of the Products and Solar Trackers, for all labelling, packaging, and instructions for the Products and Solar Trackers, and (c) Licensee will ensure that the Products' and Solar Tracker' comply, in all material respects, with all applicable laws and regulations.

5.3     <u>Compliance with Laws; Foreign Registration and Laws.</u>  Licensee will register this Agreement with any foreign governmental agency that requires such registration; and, Licensee will pay all costs and legal fees in connection with such registration. Licensee will comply, in all material respects, with all laws affecting the Sale of Products.  Each Party will comply, in all material respects, with all applicable U.S. and foreign laws applicable to its own performance and activities in connection with this Agreement.

**SECTION 6**
**PATENT PROSECUTION AND MAINTENANCE**

6.1     <u>Control.</u>  FCX will be responsible for the preparation, filing, prosecution, protection, defense and maintenance of the Patents, except that FCX will file and reasonably prosecute patent applications for the Patents in any jurisdiction reasonably requested by Licensee. FCX will, at Licensee's cost and expense (a) diligently file, prosecute, and maintain (in each case, to the extent reasonable to do so in FCX's reasonable business discretion) such Patents using qualified outside patent counsel and foreign patent associates and will keep Licensee reasonably advised of the status of actual and prospective filings for Patents, (b) furnish Licensee with copies of all material correspondence relating to the Patent from any patent office, and (c) give Licensee a reasonable opportunity to provide comments on and make requests of FCX concerning such applications and any material responses to correspondence relating to the Patent from any patent office; and, FCX will consider in good faith any such comments and requests; however, final decision-making authority will vest in FCX.  If FCX determines to abandon a patent or patent application (that is not subject to a continuation, continuation-in-part, divisional or other continuing application), or not file a patent application for the Patents requested by FCX, or otherwise take any reasonable action, requested by Licensee, in any country prior to any applicable filing deadline or other date by which FCX must act to avoid losing any of Patents or rights therein in any country, promptly and, in any event reasonably prior to, and, to the extent reasonably practicable, at least 30 days in advance of any relevant deadline: (i) FCX will notify Licensee of its determination in writing; (ii) upon receipt of such notice, Licensee may, at its own cost and expense, allow counsel reasonably selected by FCX to, file, prosecute, and maintain (in its sole discretion) such Patent in FCX's name; (iii) upon Licensee's request, FCX will promptly provide all files related to filing, prosecuting, and maintaining such Patent to counsel selected by Licensee; and (iv) FCX will no longer be responsible for costs, expenses or other obligations relating to filing, prosecuting, and maintaining (as applicable) such Patent.

Final 13 May 2019
Confidential

6.2     Reimbursement. Licensee will reimburse FCX for all reasonable, documented, out-of-pocket expenses incurred by FCX for any such applications and patents issuing therefrom (including any fees necessary to maintain such patents) within thirty (30) days after the date of each invoice from FCX for such expenses, provided, however that in the event FCX grants any further licenses to the Patents to any third party, such expenses will be adjusted by a pro rata percentage based on the then current number of licensees.

## SECTION 7
## THIRD PARTY INFRINGEMENT; JOINT INTEREST

7.1     Third Party Infringement. Each Party will promptly notify the other Party of any knowledge it acquires of any actual infringement of the Patents with respect to Solar Trackers (the "**Third Party Product**").

7.2     Actions.

(a)     FCX may, in its sole discretion, choose to enforce the Patents against any Third Party Product and any other product or activity that may infringe the Patents (including the right to seek past damages and injunctive relief) by filing suit in its own name.  Licensee will reasonably cooperate in any such proceeding; and, FCX will pay any out-of-pocket expenses incurred by Licensee in connection with any such cooperation or otherwise incurred by Licensee in any such proceeding solely to the extent pertaining to FCX's enforcement of any Patents against any such Third Party Product.

(b)     If FCX does not take legal action to terminate any infringement by any such Third Party Products or FCX has not otherwise commenced negotiations with the suspected supplier of such Third Party Products for the discontinuance of such infringement, in each case, within one-hundred and eighty (180) days after receipt of notice of the existence of such infringement, then at Licensee's request, Licensee and FCX will meet and discuss FCX's reasons for not initiating a proceeding or otherwise making a claim. If, after having given due consideration to FCX's reasons, Licensee desires to initiate a proceeding or otherwise make or bring a claim of infringement with respect to the Third Party Product, Licensee will so notify FCX and Licensee may thereafter institute, prosecute, and control any such proceeding, at its sole cost.  If, in any such proceeding initiated or caused by Licensee, FCX is required to join for standing or other purposes, then FCX will join such proceeding, at Licensee's expense. Licensee will defend, indemnify and hold FCX harmless against any claims, actions, losses, damages, expenses or other liabilities incurred by FCX or its Affiliates (including any employees, agents or contractors of the foregoing) as a result of Licensee initiating or threatening any Patent infringement proceeding or claim or the joinder of FCX or its Affiliates in any such proceeding (including whether such claims are brought as claims, counterclaims, cross-claims or as a declaratory judgment).  Licensee will not, in any such proceeding, take any position or action that would likely result in an adverse effect on the scope, claims, validity or enforceability of any of the Patents. Licensee will keep FCX reasonably informed throughout any dispute or proceeding and will discuss material litigation strategy or issues with FCX that may adversely affect the scope, claims, validity or enforceability of any of the Patents and consider in good faith FCX's recommendations and suggestions regarding such strategy or issues.  Licensee will not enter into a settlement with any such infringer without the prior written consent of FCX, such consent not to be unreasonably withheld, delayed or conditioned. Licensee will have the sole and exclusive right to elect counsel for any suit initiated by it pursuant this Section, provided that such counsel is reasonably acceptable to Licensee.  FCX will have the right to participate in and be represented by counsel of its own selection and, except as provided in this Section, at its own expense in any proceeding initiated by Licensee.

(c)     Each Party will cooperate fully in any action under this Section 7.2 (and Licensee will

7

Final 13 May 2019
Confidential

reasonably cooperate with any action that FCX initiates against any other third party for infringement proceedings under the Patents that do not involve Solar Trackers), including executing legal papers and cooperating in the enforcement as may be reasonably requested by and at the cost of the controlling Party.

(d) Any and all recoveries resulting from a suit, action, or proceeding relating to a claim of infringement of the Patents by Third Party Products initiated or caused by Licensee will first be applied to reimburse the controlling Party's costs and expenses in connection with such suit, action, or proceeding (and if the other Party is obligated to join for standing purposes, the costs of the joining party will also be reimbursed, with such recoveries to be applied *pro rata* in accordance with the costs and expenses incurred by such Party if the amount of such recoveries is less than the total amount of all such costs and expenses). Licensee will pay FCX the applicable Royalties for any Third Party Products (as if Licensee has Sold such Third Party Products) out of any remaining recoveries and will be entitled to retain any remaining amounts. FCX will be entitled to retain any recoveries it receives from any action initiated by FCX.

7.3 Joint Interest. To the extent any information or documentation exchanged by the Parties with respect to the enforcement or prosecution of the Patents that reflects privileged or work product information, the Parties acknowledge such information may be protected from disclosure to any Person by the joint defense privilege, the common interest doctrine, the attorney-client privilege, the work product doctrine or other applicable privilege, right, immunity, doctrine or protection from disclosure (collectively, "***Common Interest Information***"). The sharing and exchange of any such Common Interest Information between or among the Parties and/or their respective counsel pursuant to the terms of this Agreement will not constitute a waiver of any such privilege, immunity, doctrine or protection attaching thereto, and to the contrary all such privileges, immunities, doctrines and protections will be preserved, maintained and invoked to the fullest possible extent.

## SECTION 8
## INDEMNIFICATION; INSURANCE

8.1 Licensee Indemnity. Licensee will indemnify, hold harmless, and defend FCX and its Affiliates and their respective officers, directors, employees, agents and contractors (the "***FCX Indemnified Parties***") against any and all claims, demands, liens, actions, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders, and liabilities of whatever kind or nature at law asserted by third parties (collectively, "***Claims***") against any of the FCX Indemnified Parties arising out of: (a) any breach or alleged breach by Licensee of any representation, warranty or covenant made, or obligation assumed, by Licensee pursuant to this Agreement; (b) any unauthorized exercise of rights by Licensee under the Patents; (c) Licensee's non-compliance with any applicable federal, state or local laws or with any applicable regulations; (d) any Patent Challenge initiated by Licensee or its Affiliates; (e) any injury or death of persons, damage to property, or any other damage or loss arising out of or in connection with the Products or the exercise or practice of rights (granted by FCX under this Agreement) by Licensee or any Affiliate; (f) the Products or Solar Trackers Sold, distributed, or otherwise provided by Licensee and its Affiliates, including, the design, manufacture, distribution, marketing, or sale thereof, including any alleged defects, imperfection, and/or inherent dangers (whether obvious or hidden) in the Products or Solar Trackers, or the use thereof, any product liability issues or claims, the packaging or labeling of any Product or Solar Tracker, the failure of a Product or Solar Tracker to confirm to its published specifications or promotional or other informational materials, or a failure to warn; or, (g) any willful misconduct or negligent conduct of Licensee. Without limiting or otherwise affecting the foregoing, Licensee acknowledges and agrees that any use by Licensee of rights under the Patents is at Licensee's sole risk.

8.2 **FCX Indemnity**. FCX will indemnify, hold harmless, and defend Licensee and its Affiliates and

8

Final 13 May 2019
Confidential

their respective officers, directors, employees, agents and contractors (the **"Licensee Indemnified Parties"** against any and all Claims against any of the Licensee Indemnified Parties arising out of: (a) FCX's non-compliance with any applicable federal, state or local laws or with any applicable regulations; or (b) any willful misconduct or grossly negligent conduct of FCX.

8.3     Licensee Insurance. Licensee will maintain throughout the Term and two (2) years thereafter, at its own expense, product liability and general liability insurance from an insurance company whose A.M. Best rating is A-VIII or better, providing protection for FCX and Licensee against any such claims or suits in amounts (including umbrella coverage) no less than five million dollars ($5,000,000) per occurrence, combined single limits.   Within thirty (30) days from the date of renewal of Licensee's insurance policy, Licensee will submit to FCX a fully paid policy or certificate of insurance naming FCX as an additional insured party and requiring that the insurer will not terminate or materially modify such policy or certificate of insurance without written notice to FCX.   All insurance maintained by Licensee will be primary and non-contributory with respect to any insurance maintained by FCX.   Obtaining and maintaining such insurance and the delivery to FCX of the policy or certificate are material obligations of Licensee.

## SECTION 9
## REPRESENTATIONS AND WARRANTIES AND ADDITIONAL COVENANTS

9.1     Mutual Warranties. Each Party represents and warrants that: (a) it is a duly organized and validly existing company; (b) it has the full right, power and authority to enter into and perform its obligations under this Agreement; (c) the person signing this Agreement on behalf of such Party has the full right, power and authority to sign this Agreement and to bind such Party to its respective obligations under this Agreement; and, (d) that the execution, delivery and performance of this Agreement does not conflict with any other agreement to which such Party is bound.

9.2     By FCX.  FCX  represents, warrants and covenants that:

(a)     FCX solely owns the Patent and is entitled to grant the license and other rights granted herein, FCX has not granted to any third party any rights or licenses that conflict with the license granted to Licensee, and, at all times during the Term, except for the settlement of past infringement, it will not subject any Patent rights to any license, covenant not to sue or other right that would allow a third party to exercise any of the rights exclusively granted to Licensee hereunder. As of the Effective Date, there are no actual, pending, alleged or threatened actions, suits, claims, interferences, oppositions or governmental investigations involving the Patents. As of the Effective Date, to the knowledge of FCX, except for the acts of Licensee prior to the Effective Date, there is no actual, pending, alleged, or threatened infringement by a third party of any of the claims of the Patent.

(b)     As of the Effective Date, FCX has submitted all material prior art known to FCX that it is required to submit to the applicable patent office examining any of the Patents.

(c)     There has been no conduct by or on behalf of FCX that constitutes inequitable conduct.

9.3     By Licensee.  Licensee represents, warrants and covenants that prior to the Effective Date, Licensee has: (a) only Sold Voyager branded Solar Trackers that control Solar Panels with a designed DC output wattage of 34 MW; and, (b) not Sold any AP90 trackers that constitute Solar Trackers.

9.4     Disclaimer of Warranties.  EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 9, NEITHER PARTY MAKES ANY (AND HEREBY DISCLAIMS ALL) REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, AS TO THE

PRODUCTS, THE FITNESS FOR ANY USE OR PARTICULAR PURPOSE, MERCHANTABILITY, SAFETY, EFFICACY, APPROVABILITY BY REGULATORY AUTHORITIES, TIME AND COST OF DEVELOPMENT, PATENTABILITY, AND/OR BREADTH OF ANY PATENT RIGHTS, TECHNOLOGY RIGHTS, OR MARKS, OR WHETHER ANY PATENT OR MARK IS VALID, WHETHER THERE ARE ANY PATENTS OR OTHER RIGHTS NOW HELD, OR WHICH WILL BE HELD, BY OTHERS THAT MIGHT BE REQUIRED FOR THE PRODUCTS, THAT THE INVENTIONS CONTAINED IN ANY PATENT DO NOT INFRINGE ANY OTHER PATENTS OR OTHER RIGHTS NOW HELD OR THAT WILL BE HELD BY ANY PERSON, ANY OBLIGATION TO OPERATE OR MAINTAIN THE PRODUCT OR ANY SOLAR TRACKER, OR ANY OTHER WARRANTY ARISING FROM A COURSE OF DEALING OR USAGE OF TRADE.

## SECTION 10
## TERM AND TERMINATION

10.1    Term.  Unless earlier terminated as provided herein, the term of this Agreement will commence on the Effective Date and continue until the expiration of all Patents (if any) and the cancellation, withdrawal, or express abandonment of all patent applications under the Patents (if any)(the "*Term*"). The Royalty Term, in a country, may be shorter than the Term.

10.2    Termination by FCX.  FCX will have the right to terminate this Agreement if:

(a)    Licensee materially breaches this Agreement and such material breach continues for a period of thirty (30)  days  after FCX has provided written notice thereof setting forth in detail the nature of the alleged material breach; and,

(b)    Licensee or its Affiliate initiates any Patent Challenge.

10.3    Termination by Licensee.    Licensee will have the right to terminate this Agreement for convenience upon providing at least thirty (30) days written notice thereof.

10.4    Other Conditions of Termination. This Agreement will terminate:

(a)    Immediately without the necessity of any action being taken by FCX or Licensee: if (i) Licensee becomes bankrupt or insolvent; (ii) Licensee's board of directors elects to liquidate its assets or dissolve its business; (iii) Licensee ceases its business operations; (iv) Licensee makes an assignment for the benefit of creditors; or (v) if the business or assets of Licensee are otherwise placed in the hands of a receiver, assignee or trustee, whether by voluntary act of Licensee or otherwise;

(b)    As provided in Section 3.3; or

(c)    As provided for in Section 11.4.

10.5    Effects of Expiration or Termination of Agreement.  If this Agreement expires or is terminated for any reason:

(a)    The licenses granted hereunder will terminate.;

(b)    Licensee will tender payment of all accrued Royalties and other payments due to FCX as of the effective date of termination or expiration within 30 days thereafter, provided, however that no Minimum Fees will be due with respect to the year of expiration or termination;

10

Final 13 May 2019
Confidential

        (c)     Nothing in this Agreement will be construed to release either Party from any obligation that matured prior to the effective date of termination; and,

        (d)     The following Sections survive any termination or expiration of this Agreement: SECTION 3 (with respect to   Milestone Payments and Royalties accruing prior to expiration or termination), SECTION 4 (with respect to amounts accruing prior to expiration or termination), 6.2, 7.2 (with respect to any proceedings initiated prior to expiration or termination), 7.3, SECTION 8, 9.2, 10.5, and SECTION 11.

## SECTION 11
## MISCELLANEOUS

11.1    Entire Agreement; Amendment; Waiver.  This Agreement sets forth the entire agreement and understanding of the Parties relating to the subject matter herein, and supersedes all prior and contemporaneous agreements, proposals, negotiations, conversations, discussions and understandings, written or oral, with respect to such subject matter and all past dealing or industry custom. No modification, addition or deletion, or waiver of any rights under this Agreement is binding on a Party unless made in a non-preprinted agreement clearly understood by the Parties to be a modification or waiver, and signed by a duly authorized representative of each Party. No failure or delay (in whole or in part) on the part of a Party to exercise any right or remedy hereunder will operate as a waiver thereof or effect any other right or remedy. All rights and remedies hereunder are cumulative and are not exclusive of any other rights or remedies provided hereunder or by law. The waiver of one breach or default or any delay in exercising any rights will not constitute a waiver of any subsequent breach or default.

11.2    Independent Contractors.   Neither Party is an agent, franchisor, franchise, employee, representative, owner nor partner of the other Party, and the relationship between the Parties will only be that of independent contractors. Neither Party has any right or authority to assume or create any obligations or to make any representations or warranties on behalf of any other Party, whether express or implied, or to bind the other Party in any respect whatsoever.

11.3    Notices.  Any notice required or permitted by this Agreement will be in writing and will be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile if such notice is addressed to the other Party at such Party's address or facsimile number as set directly forth below, or as subsequently modified by written notice in accordance with the terms in this Section.

**If to LICENSEE:**                    **If to FCX:**

With copies to:                     With copies to:

Tony Etnyre                         Peter Kinsella
11801 Domain Blvd 3rd FL          Perkins Coie LLP
Austin, TX 78758                 1900 Sixteenth Street, Suite 1400
                                 Denver, CO 80202
Telephone No. (512) 560-7993       Telephone No.: (303) 291-2328

11.4    Assignment.  Neither Party may assign or otherwise transfer its rights under this Agreement, in whole or in part, by operation of law, Change of Control or otherwise, to any third party without the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or

Final 13 May 2019
Confidential

delayed. Notwithstanding the foregoing, each Party will have the right to assign this Agreement without consent to an Affiliate of such Party, in which case the assigning Party will remain liable for its obligations under this Agreement, or to a successor to all or substantially all of the assets of the other Party (whether by assignment, merger, Change of Control or otherwise). Consent of the Licensee will also be required for any transaction that would result in the transfer of ownership of the Patents to a third party that is not an US entity. Any assignment or transfer not in accordance with this <u>Section 11.4,</u> will be void.

11.5     <u>Governing Law.</u> This Agreement is made and will be governed by the laws of the State of New York, excluding its choice of law principles. The Parties hereby consent to the exclusive jurisdiction and venue of a competent court sitting in the state of New York, for the adjudication of all matters arising from the subject matter of this Agreement.

11.6     <u>Bankruptcy.</u> FCX acknowledges that all licenses granted by it under or pursuant to this Agreement are intended to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the "***Bankruptcy Code***") and any similar provisions of applicable Laws of other jurisdictions ("***Other Bankruptcy Laws***"), licenses of rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code and similar provisions of Other Bankruptcy Laws. FCX acknowledges that if FCX, as a debtor, rejects this Agreement, Licensee may elect to retain its rights under this Agreement to the extent provided in Section 365(n) of the Bankruptcy Code (or any successor provision) and any similar provisions of Other Bankruptcy Laws.

11.7     <u>Severability.</u> Each provision contained in this Agreement constitutes a separate and distinct provision severable from all other provisions. If any provision (or any part thereof) is unenforceable under or prohibited by any present or future law, then such provision (or part thereof) will be amended, and is hereby amended, so as to be in compliance with such law, while preserving to the maximum extent possible the intent of the original provision. Any provision (or part thereof) that cannot be so amended will be severed from this Agreement; and, all the remaining provisions of this Agreement will remain unimpaired.

11.8     <u>Interpretation.</u> In this Agreement: (a) the headings are for convenience of reference only and will not affect the meaning or interpretation of this Agreement; (b) the words "herein," "hereunder," "hereby" and similar words refer to this Agreement as a whole (and not to the particular sentence, paragraph, Article or Section where they appear); (c) terms used in the plural include the singular, and vice versa, unless the context clearly requires otherwise; (d) the word "including" will be construed to mean "including, without limitation; (e) unless expressly stated herein to the contrary, reference to any applicable law means such applicable law as amended, modified, codified, replaced or reenacted, in whole or in part, and as in effect from time to time, including any rule or regulation promulgated thereunder; (f) "or" is used in the sense of "and/or"; "any" is used in the sense of "any or all"; and "with respect to" any item includes the concept "of" such item or "under" such item or any similar relationship regarding such item; (g) unless expressly stated herein to the contrary, reference to an Article, Section or Schedule is to an article, section, schedule, or exhibit, respectively, of this Agreement; (h) when calculating a period of time, the day that is the initial reference day in calculating such period will be excluded and, if the last day of such period is not a business day, such period will end on the next day that is a business day; and (i) the Parties participated jointly in the negotiation and drafting of this Agreement and the documents relating hereto, and each Party was (or had ample opportunity to be) represented by legal counsel in connection with this Agreement, and each Party and each Party's counsel has reviewed and revised (or had ample opportunity to review and revise) this Agreement; therefore, if an ambiguity or question of intent or interpretation arises, then this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the terms hereof or thereof.

11.9    Counterparts. This Agreement may be executed simultaneously by the Parties with any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Execution of this Agreement may be accomplished by signing, including via electronic signature, and transmitting the signature page to the other Party.

*[Signature Page Follows]*

13

IN WITNESS WHEREOF, the Parties have caused this Patent License Agreement to be executed by their duly authorized representatives as of the Effective Date first written above.

**FCX:**                                              **LICENSEE:**

**FCX SOLAR, LLC**                          **FTC SOLAR INC.**

By: _____         By: _____

Name: FRANK OUDHEUSDEN              Name: Anthony P. Etnyre
Title: OWNER- FCX SOLAR             Title:   Chief Executive Officer

14

## EXHIBIT A
## PATENTS

- US Patent Application Serial No. 16/274,557 - Solar Tracker System