UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
FCX SOLAR, LLC,                                 :
                                                :
                        Plaintiff,              :          Case No. 1:21-CV-03556-RA
                                                :
          v.                                    :     __FIRST AMENDED COMPLAINT__
                                                :
FTC SOLAR, INC.,                                :        __JURY TRIAL DEMANDED__
                                                :
                        Defendant.              :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## __Nature of the Action__

1.     Plaintiff FCX Solar, LLC ("Plaintiff" or "FCX") brings this action against defendant FTC Solar, Inc. ("Defendant" or "FTC") to require FTC to pay contractually agreed-upon royalties for FTC's sales of products designed and built using Plaintiff's intellectual property and with the assistance of Plaintiff's consulting services.

2.     Plaintiff is an engineering consultancy and green technology development firm that provides engineering services to solar power developers and develops intellectual property in the solar structures space—solutions to engineering problems that can be licensed to other companies.

3.     Defendant FTC Solar, Inc. develops and sells solar tracker systems to utilities and other large-scale producers of solar power.  A solar tracker system allows a photovoltaic cell to track the movement of the sun through the sky over the course of a day, increasing the efficiency and output of a solar array.

4.     In the fall of 2017, FTC approached Plaintiff about improving FTC's next generation of solar tracker technology.  FTC apparently believed that some of the intellectual property that Plaintiff had developed—particularly, a type of damper device that allows movable

solar arrays to withstand heavy winds—could be useful to FTC.  As negotiations continued, FTC continuously solicited information from Plaintiff under a nondisclosure agreement that, Plaintiff would learn, FTC had no intention of honoring.

5.      Having reviewed the details of Plaintiff's engineering solution, FTC retained Plaintiff for a narrow and time-limited consulting engagement.  But rather than moving forward with a broader licensing or consulting deal at that time, FTC simply began incorporating Plaintiff's design into its new line of solar trackers—without a license and without compensating Plaintiff in any way.

6.      FTC's duplicity was not revealed until September 2018, when an FCX partner visited FTC's booth at a trade show, featuring the new tracker, and recognized the product's damper design as the very same one that Plaintiff had developed and disclosed to FTC.

7.      When confronted with clear evidence of its wrongful use of Plaintiff's intellectual property, FTC's CEO Anthony P. Etnyre ("Etnyre") immediately acknowledged that FTC had acted wrongfully. To avoid a legal battle that he knew FTC could not win, Etnyre then offered to make things right—FTC would enter into a licensing agreement with Plaintiff after all, as well as a consulting agreement so that Plaintiff could assist FTC with integrating Plaintiff's damper technology. Etnyre represented that FTC and Plaintiff would work together to improve the finished product and would together benefit from its sales.

8.      The parties began negotiating both the licensing agreement and the consulting agreement in tandem—the two agreements, together, were essential components of the overall deal between Plaintiff and FTC.  The parties executed a nonbinding Term Sheet for IP Licensure (the "Term Sheet") which summarized the terms of both the consulting agreement and the license agreement, on or about March 21, 2019.

9.     The parties negotiated a consulting services agreement dated April 6, 2019 (the "Consulting Agreement," attached hereto as Exhibit A, with all appendices) and an exclusive patent license agreement dated May 13, 2019 (the "License Agreement," attached hereto as Exhibit B). The Consulting Agreement provided Plaintiff with a modest hourly rate for its work, but reserved most of Plaintiff's compensation for the Licensing Agreement. The Royalty provision of the Licensing Agreement was intended to allow Plaintiff to share in FTC's success by entitling Plaintiff to a percentage of sales revenues from products sold that incorporate Plaintiff's intellectual property (calculated as a fee per watt of aggregate power generating capacity sold by FTC). This structure backloaded Plaintiff's compensation and ensured that the agreement would become more lucrative over time if—as in fact happened—Plaintiff's engineering solutions resulted in a more marketable product.

10.     With the help of Plaintiff's intellectual property and consulting work, FTC began to thrive. Its product revenue more than tripled year-over-year, from $43 million in 2019 to nearly $159 million in 2020. Between May 2019 and June 2020 FTC paid Plaintiff more than $1.4 million in royalties on these sales.

11.     Since then, FTC's business has only continued to grow. But since July of 2020, FTC has not paid Plaintiff a nickel in royalties. Apparently, FTC would rather go back to the way it used to do business—stealing and profiting off of Plaintiff's intellectual property without license or payment.

12.     FTC attempted to cut Plaintiff out of its share of FTC's success on the eve of its initial public offering. FTC has long concealed from its supporters and investors the company's absolute reliance on Plaintiff's intellectual property for the profitability of its products. In a transparent effort to paper over this vulnerability on the eve of its IPO, FTC baselessly claimed

3

that it is not now (and, astonishingly and inexplicably, that it never has been) selling any products that incorporate Plaintiff's intellectual property.

13.     FTC's failure to pay Plaintiff the millions of dollars in royalties owed for Q3 and Q4 2020 and Q1 and Q2 2021, as well as certain milestone payments, is a material breach of the License Agreement.

14.     Moreover, if FTC truly believed from day one that its products did not incorporate Plaintiff's intellectual property, then it fraudulently induced Plaintiff to enter into the Consulting Agreement and the License Agreement, and thereafter falsely paid licensing fees in 2019 and 2020 with the intention of seeking their return, in order to receive engineering consulting services worth far more—services that FTC has no intention of paying for today.  FTC cannot in good conscience be permitted to keep these ill-gotten gains.

15.     FTC holds itself out as a "global provider of advanced solar tracker systems" and touts its "proprietary architecture advances that lower installation cost and improve operational performance."  But the proprietary architecture advances at the heart of every solar tracker system sold by FTC are of Plaintiff's design.  FTC materially misleads the market, and steals from Plaintiff, every time it claims otherwise.

### The Parties

16.     Plaintiff FCX is a Pennsylvania limited liability company.  The sole members of FCX are Christopher Needham ("Needham"), a natural person who is a citizen of the State of Maryland, and Frank Oudheusden ("Oudheusden"), a natural person who is a citizen of the State of New Hampshire.

17.     Defendant FTC is a corporation duly organized and existing under the laws of the State of Delaware and with its principal place of business in Austin, Texas.

**Jurisdiction and Venue**

18.     There is complete diversity of citizenship between the parties.  Plaintiff FCX is a citizen of the States of New Hampshire and Maryland.  Defendant FTC is a citizen of the States of Delaware and Texas.

19.     The matter in controversy substantially exceeds the sum or value of $75,000 exclusive of interest and costs.  Defendant owes Plaintiff $135,000 in outstanding milestone payments alone.  Defendant further holds $109 million of executed contracts and awarded orders, all for products incorporating Plaintiff's licensed design.

20.     Defendant is subject to personal jurisdiction in the State of New York by consent. The License Agreement provides: "The Parties hereby consent to the exclusive jurisdiction and venue of a competent court sitting in the state of New York, for the adjudication of all matters arising from the subject matter of this Agreement."

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this district for purposes of venue pursuant to 28 U.S.C. § 1391(c)(2).  The License Agreement provides: "The Parties hereby consent to the exclusive jurisdiction and venue of a competent court sitting in the state of New York, for the adjudication of all matters arising from the subject matter of this Agreement."

**Factual Allegations**

A.     **FTC's Origins**

22.     FTC was born from the ashes of a large publicly held solar energy firm, SunEdison Inc. ("SunEdison").

23.     In April 2016, SunEdison filed for Chapter 11 protection.  Its stock was delisted from the New York Stock Exchange shortly thereafter.

5

24.     At the time that SunEdison filed for Chapter 11 protection, its CEO was Ahmad Chatila ("Chatila").

25.     In a Form 8-K filed on April 14, 2016, SunEdison announced that its audit committee had concluded that there were "issues with [SunEdison's] overly optimistic culture and its tone at the top," that management had provided the board with overly optimistic cash forecasts, and that the company "lacked sufficient controls and processes regarding [SunEdison's] managing of cash flows."

26.     The Wall Street Journal reported in an April 14, 2016 article that Chatila misled both the board and investors regarding SunEdison's liquidity.

27.     Former SunEdison executives, including Chatila, founded FTC in January 2017. Chatila remains a director of FTC.

28.     Upon information and belief, FTC purchased SunEdison assets, including intellectual property, out of SunEdison's bankruptcy estate.  This acquisition included SunEdison's AP90 solar tracker.

**B.     Plaintiff Discloses the Intellectual Property to FTC**

29.     On or about September 11, 2017, Needham and Oudheusden met with FTC executives at the Solar Power International Conference in Las Vegas, Nevada.  FTC executives remembered Needham and Oudheusden as talented engineers who had worked downstream at SunEdison.  At the meeting, FTC solicited from Plaintiff a proposed consulting engagement to evaluate the market for solar trackers and the competitive strength of FTC's AP90 solar tracker.

30.     On or about September 16, 2017, FTC engaged Plaintiff to conduct the market evaluation.  Plaintiff concluded its work on or about October 5, 2017.

31.     In November 2017, Plaintiff disclosed intellectual property to FTC under the protection of their continuing nondisclosure agreement concerning a patent that it was pursuing

for a passive load-sharing damper that would allow significant cost-savings for solar tracker manufacturers by reducing structural steel costs.  The nondisclosure agreement is attached hereto as Exhibit C.

32.     The purpose of Plaintiff's disclosure of the intellectual property was to assist FTC in evaluating the possibility of developing a further business relationship with Plaintiff.

33.     After reviewing Plaintiff's intellectual property, FTC declined to move forward with a license or a broader consulting relationship with Plaintiff.

**C.     FTC Incorporates Plaintiff's Intellectual Property Without a License**

34.     Needham and Oudheusden attended the 2018 Solar Power International conference in Anaheim, California in September 2018 and visited FTC's booth.  In the booth, FTC was exhibiting a prototype of its successor to the AP90, the FTC Voyager Tracker.

35.     The prototype Voyager Tracker that FTC exhibited utilized Plaintiff's intellectual property—the same intellectual property that Plaintiff had disclosed to FTC in November 2017.

36.     Among other elements, the prototype Voyager Tracker that FTC exhibited utilized Plaintiff's design for a "damper," a critical component of a solar tracker which absorbs wind vibration and wind shock that can otherwise lead to damage or failure of the photovoltaic cells.

37.     At the time that FTC exhibited the prototype Voyager Tracker, Plaintiff had not yet granted FTC a license to use its intellectual property.

38.     On September 26, 2018, upon viewing the prototype Voyager Tracker, Needham and Oudheusden confronted FTC executives including Etnyre, co-founder David Springer, Mitch Bowman, Milo Zabala, and Nagendra Cherukupalli regarding the unlicensed use of Plaintiff's intellectual property.

39.     During this meeting, Plaintiff and FTC agreed that the prototype Voyager Tracker included design features that "overlapped" with Plaintiff's intellectual property and that the appropriate solution would be for FTC to license the intellectual property from Plaintiff.

40.     During this meeting, Needham proposed to FTC that significant additional value could be realized if FTC fully utilized Plaintiff's intellectual property and additional knowhow.

41.     On September 28, 2018, Oudheusden memorialized the September 26, 2018 meeting in an email to Etnyre and Mitch Bowman.  The email is attached hereto as Exhibit D. *See* Exhibit D at 3.

42.     In his email, Oudheusden prefaced his summary of the September 26, 2018 meeting by requesting that FTC correct any inaccuracies they perceived in the summary:  "Chris and I worked hard to make sure the below synopsis was comprehensive and correct.  If you find any detail to be inaccurately stated or if there are details you'd like included, please let me know. Otherwise we would appreciate a confirmation e-mail."  *Id.* at 3.

43.     In his email, Oudheusden wrote that on September 26, 2018, at 11 am, he and Needham were "invited to see the new design" of the Voyager tracker "and provided feedback. During the course of those discussions it was discovered that vital design features had a possible overlap with FCX intellectual property, which was disclosed to FTC.  Those concerns were politely voiced and another meeting for later that day (4:30 pm) was set for discussion."

44.     In his email, Oudheusden wrote that on September 26, 2018, after Plaintiff expressed concern regarding the use of its intellectual property in FTC's tracker, FTC "researched . . . their design process, timeline and technology with the broader FTC team and discovered that they had inadvertently overlapped Voyager design features with FCX IP.  The

intent of the overlap was unintentional, both parties (FTC and FCX) agreed that overlap existed and that a viable licensed solution could be reached amicably."

45.    In responding to Oudheusden's email, Etnyre wrote: "We are largely in alignment with the summary below" and proposed the terms of a license agreement. *See id.* at 1.

46.    In his response, Etnyre did not dispute any portion of Oudheusden's email summary as having been "inaccurately stated" and did not request that any additional details be "included" in the summary.  Etnyre also never denied that the prototype Voyager Tracker incorporated Plaintiff's intellectual property.

47.    Etnyre's email was sent for the purpose of inducing Plaintiff to enter into a licensing agreement and/or a consulting agreement with FTC.

**D.    Plaintiff and FTC Enter Into the Term Sheet**

48.    During fall 2018 and winter 2019, Plaintiff and FTC continued to negotiate the terms of the license agreement and consulting agreement.

49.    On March 11, 2019, Needham exchanged emails with FTC's director of engineering, Mitch Bowman ("Bowman") regarding the terms of the proposed license agreement.  The March 11 email chain is attached hereto as Exhibit E.  One possible fee structure that Needham and Bowman discussed was to award Plaintiff a percentage of the cost savings achieved through utilization of Plaintiff's intellectual property against the baseline cost.

50.    Bowman expressed a concern with the ability to implement this structure because the Voyager Tracker had *already* incorporated Plaintiff's intellectual property.  Bowman wrote: "My only concern is the 'COGS [cost of goods sold] with no IP overlap' baseline?  To really flush this out, we'd basically need to design and price a new product that will never be sold.  We cannot afford to allocate already overloaded teams time to this exercise."

51.     Before the parties entered into the Consulting Agreement or the License Agreement, FTC represented to Plaintiff that all of FTC's tracker products already incorporated Plaintiff's intellectual property—to create a baseline against which the benefits of Plaintiff's intellectual property could be measured, FTC would need to design an entirely new tracker that did not yet incorporate Plaintiff's intellectual property.  But as Bowman made clear, such a product would "never be sold."  FTC expressly stated to Plaintiff that all of the solar trackers it currently sold, and all of the solar trackers it intended to sell going forward, already utilized and would continue to utilize Plaintiff's intellectual property.

52.     On or about March 19, 2019, Plaintiff and FTC reached an oral agreement regarding the terms of the license agreement and consulting agreement.  Plaintiff memorialized these terms in a nonbinding Term Sheet—addressing the key terms of both the license agreement and the consulting agreement—which Plaintiff sent to FTC.  A copy of the email from Needham to Etnyre and Bowman attaching the Term Sheet is attached hereto as Exhibit F.  A copy of the Term Sheet is attached hereto as Exhibit G.

53.     In his cover email attaching the Term Sheet, Needham wrote that, after FTC signed the Term Sheet, Plaintiff would "then send to our lawyer to draft the license agreement and can sign a separate consulting agreement in the meanwhile."  Needham wrote that after the "mutually acceptable license agreement" was "fully executed" and both "agreements" were "finalized," he could schedule a trip to begin meeting with the FTC team and providing the contracted-for consulting services.  Ex. G.

54.     Through Needham's March 19, 2019 email, Plaintiff again made clear to FTC that (i) the license agreement and the consulting agreement were both components of one larger deal between the parties, and (ii) Plaintiff did not intend to begin performing under the consulting

agreement until both the consulting agreement and the license agreement were finalized and executed.

55.     The Term Sheet also reflects the relationship between the license agreement and the consulting agreement.  Parts #1 through #6 of the Term Sheet set out the milestone payments and royalty payments that will be due under the license agreement—the primary framework for compensating Plaintiff for its work.  Part #8 states that the consulting work that Plaintiff provides in connection with the "SAT [Single Axis Tracker] IP implementation and development effort, and advisement on previous work product performed," will be billed to FTC "at a cost of $190/hour," to be "captured in a separate agreement and accounted as 1099 income."  Exhibit G.

56.     Similarly, the first page of the Term Sheet states:  "We feel this deal offers tremendous incentive for both parties to continue innovating collaboratively and create the best-in-class single axis tracker we all know is possible with this team.  We are excited to get to work."  Exhibit G.  The "incentive" refers to the back-loaded nature of Plaintiff's compensation under the deal—FTC would pay little up front for consulting services, but share its revenues with Plaintiff going forward.  Plaintiff would be compensated proportionately to FTC's sales.  If FTC was unable to bring the product based on Plaintiff's intellectual property to market, neither FTC nor Plaintiff would be compensated.  But if Plaintiff's assistance enabled FTC to succeed, then Plaintiff would share in that success.

57.     FTC acknowledged that the Term Sheet reflected its understanding of the parties' agreement regarding the entire deal—the license agreement and the consulting agreement—and did not request that any changes be made.  On behalf of FTC, Etnyre executed the Term Sheet on March 21, 2019.

**E.     Plaintiff and FTC Enter Into the Consulting Agreement**

58.     Plaintiff and FTC entered into the Consulting Agreement on April 6, 2019.

59.     The executed Consulting Agreement largely reflected the terms that the parties had agreed to in the Term Sheet.

60.     In the Consulting Agreement, Plaintiff agreed to provide FTC with consulting services regarding the "continued development of the Voyager single-axis tracker platform."

61.     The Consulting Agreement set forth that Plaintiff's compensation for this work would be $190.00 per hour per individual (plus reimbursement of reasonable expenses).

62.     Plaintiff agreed to provide consulting services at such a low hourly rate because it was contemplated that Plaintiff would also be compensated through the License Agreement, including its royalty provisions. Had FTC not executed the Term Sheet, been participating in good-faith negotiations regarding the License Agreement, and represented in the Term Sheet and in such negotiations that the License Agreement would include royalty payments, Plaintiff would not have entered into the Consulting Agreement. The Consulting Agreement was never intended by either party to be a standalone agreement, but rather was one component of the broader deal between Plaintiff and FTC.

63.     In Section 5.1 of the Consulting Agreement, FTC agreed that Plaintiff would retain and own "all right, title, and interest in and to . . . the FCX Core IP and any FCX Improvement created by FCX or [FTC] (including any FCX Improvement that is jointly created with [FTC])."

64.     The Consulting Agreement defines "FCX Core IP" to mean "all Intellectual Property conceived, developed, reduced to practice or otherwise owned by FCX prior to the Effective Date," that is, April 6, 2019, "which, for clarity includes, the FCX damper Intellectual Property, the Intellectual Property licensed to [FTC] as set forth in the Patent License Agreement and wind tunnel testing techniques related to the FCX damper Intellectual Property."

65.     The Consulting Agreement defines "FCX Improvement" to mean "any invention (whether or not patentable), improvement, modification, derivative work, or variation of any invention, method, system, or technology pertaining to the FCX Core IP."

66.     Under the terms of Section 5.1 of the Consulting Agreement, FCX expressly "does not grant [FTC] rights to use the FCX Core IP or FCX Improvement . . . as any rights are provided under the [License Agreement]."

67.     Section 9.3 of the Consulting Agreement provides that FTC's agreement regarding Plaintiff's ownership of FCX Core IP and FCX Improvements in Section 5.1 of the Consulting Agreement will survive any termination or expiration of the Consulting Agreement.

**F.     <u>Plaintiff and FTC Enter Into the License Agreement</u>**

68.     Plaintiff and FTC entered into the License Agreement effective May 13, 2019.

69.     The License Agreement was, after the Consulting Agreement, the second component of the deal between Plaintiff and FTC.

70.     Although the License Agreement and Consulting Agreement were meant to be executed at or around the same time, FTC failed to provide comments to the initial draft of the License Agreement until two days after the Consulting Agreement was executed.  Plaintiff worked diligently to address FTC's substantial edits and comments to the draft agreement, and after further discussions between the parties, Plaintiff provided a near-final version of the License Agreement to FTC on April 23, 2019 addressing all of FTC's remaining comments. Plaintiff pressed FTC to review and finalize the License Agreement in the following weeks. FTC apologized for the delay, blaming travel for its procrastination.

71.     On May 14, 2019, Oudheusden of FCX emailed Etnyre of FTC, copying Needham and Bowman, writing: "It's been three weeks since we sent over the latest revisions of the contract (4.22.2019) (re-attached)."  This May 14 email is attached hereto as Exhibit H.

13

72.     In his email, Oudheusden asked when FTC planned to execute and return the License Agreement and wrote:  "I personally share your previous sentiment of my eyes being done with reviewing it [the draft license agreement].  Chris and I would like to get to work on Voyager improvements, all four of the amendments have been made to your request.  I see no further open actions, so in effect I think we agree?"  FTC responded by attaching the executed final License Agreement "with no changes to [the] document."

73.     The May 14 email makes clear that the parties viewed the License Agreement and Consulting Agreement as part of the same deal, such that Plaintiff could not move forward with the consulting relationship (*i.e.*, "get to work on Voyager improvements") until the License Agreement was also executed.  This was because Plaintiff needed to know that it would be fully compensated for its consulting work through the royalties under the License Agreement prior to undertaking more work to further integrate Plaintiff's intellectual property into FTC's Voyager solar tracker.

74.     By executing the License Agreement in response to Plaintiff's email, FTC impliedly represented to Plaintiff that it would fully compensate Plaintiff for its work on "Voyager improvements" through royalty payments, and that FTC believed that the License Agreement required such payments to be made.

75.     In the License Agreement, Plaintiff granted FTC a royalty-bearing license to *inter alia* make Products and to sell and use Products incorporated into Solar Trackers.

76.     Section 1.8 of the License Agreement defines Product to mean, "on a country-by-country basis, any product the making, using, selling, offering for sale, importing or exporting in the country in question would (without the license granted hereunder) infringe directly, indirectly by inducement of infringement, or indirectly by contributory infringement, at least one issued

Valid Claim or any pending Patent claim that would be hypothetically infringed if such pending

claim were issued in its then pending state, in such country."

77.     Section 1.13 of the License Agreement defines Valid Claim to mean, "(a) a claim

of an issued and unexpired Patent that has not been abandoned, revoked, or held unenforceable

or invalid in a decision from which an appeal cannot be taken; or (b) a claim in any pending

application for a Patent that was filed in good faith and has not been cancelled, withdrawn,

abandoned, or finally disallowed without the possibility of appeal or refiling of such application

and has not been pending for more than five years."

78.     The contractual definition of Product thus includes not just products that utilize

Plaintiff's issued patents, but also products that fall within any Patent claim pending at any time

in any of Plaintiff's patent applications.

79.     Section 1.12 of the License Agreement defines "Solar Tracker" to mean a

"device, installed at grade, incorporating the Product that uses a single-axis for orienting Solar

Panels."

80.     The contractual definition of Solar Tracker thus includes not just products that

utilize Plaintiff's issued patents, but also products that fall within any Patent claim pending at

any time in any of Plaintiff's patent applications.

81.     At the time Plaintiff and FTC entered into the License Agreement, exemplary

claims pending in Plaintiff's family of patent applications had already been disclosed to FTC.

Exhibit A at 27, 56–59.

82.     Those claims covered products with dampers that "passively transition" from "a

first damping ratio when the collection of photovoltaic modules moves at a first rate relative to

the base" to "a second damping ratio when the collection of photovoltaic modules moves at a second rate relative to the base." *Id.* at 56.

83. Those claims separately covered products with dampers "having a first damping ratio when the actuator moves the photovoltaic modules and passively transitioning to a second damping ratio that is greater than the first damping ratio when environmental loads are applied to the photovoltaic modules." *Id.* at 58.

84. FTC's Voyager product was covered by these claims on the day the License Agreement was signed.

85. FTC's Voyager product has been covered by these claims at all times since the License Agreement was signed.

86. The License Agreement also contains FTC's express agreement that its Voyager Tracker is a covered Product for which royalty payments will be owed.

87. In Section 9.3 of the License Agreement, FTC represented, warranted, and covenanted that, prior to the Effective Date, "Licensee [FTC] has: (a) only Sold Voyager branded Solar Trackers that control Solar Panels with a designed DC output wattage of 34 MW; and, (b) not Sold any AP90 trackers that constitute Solar Trackers."

88. Pursuant to Section 9.3, the AP90 tracker, which did not incorporate Plaintiff's intellectual property and was designed before Plaintiff first shared such intellectual property with FTC, did not constitute a "Solar Tracker."  But FTC represented and warranted that the Voyager tracker *did* constitute a "Solar Tracker"—that is, a "device, installed at grade, incorporating the Product that uses a single-axis for orienting Solar Panels."

89. At the time of contracting, FTC *expressly warranted* that the Voyager tracker was a Solar Tracker and contained a covered Product for which royalty payments would be owed.

16

90.     The License Agreement provides that Plaintiff will be compensated both by non-refundable milestone payments and by the payment of royalties.

91.     Section 3.1 of the License Agreement requires FTC to make the following Milestone Payments:  (a) $15,000 due within 30 days of the effective date; (b) $60,000 due within 30 days of FTC first including a device design in the bill of materials for a Solar Tracker that can be quoted by or ordered commercially from FTC or an affiliate; (c) $75,000 due within thirty days after FTC receives the first purchase order for the sale of a Solar Tracker; and (d) $50,000 due within 30 days after the first Patent issues with a Valid Claim covering a device or process for use in or with a Solar Tracker.

92.     Section 3.2 of the License Agreement requires FTC to pay royalties of $0.0015 per watt (direct current) for the first two "cumulative gigawatts of the designed DC output wattage of Solar Panels designed to be controlled by any Solar Tracker Sold by" FTC or an affiliate.

93.     After the first $3 million of royalties, the royalty per watt of output wattage declines to $0.00125 for the third cumulative gigawatt and $0.0010 per watt for watts in excess of the third cumulative gigawatt.

94.     FTC is required to pay royalties within thirty days after the end of each calendar quarter.

95.     In Section 3.5 of the License Agreement, FTC agreed to pay interest on unpaid principal of any late payments at the rate of 1.5%, compounded monthly.

96.     Section 3.3(a) of the License Agreement provides Plaintiff with the option to terminate the License Agreement early if the royalties under the agreement fall below specified minimum fees, unless FTC makes a shortfall payment to cover the difference.

97.     The amount of the minimum fee increases each year because the parties contemplated that the business would grow and that Plaintiff's compensation would increase over the life of the License Agreement.

98.     Section 4.1 of the License Agreement required FTC to provide a "true and accurate" sales report at the end of each quarter identifying all sales of Products and Solar Trackers under the License Agreement for which royalty payments have become payable.

99.     Section 10.5 of the License Agreement provides that upon termination or expiration of the License Agreement for any reason, the following things will happen:  (i) all licenses granted will terminate; and (ii) FTC will pay "all accrued Royalties and other payments due to FCX" as of the termination date within 30 days.

100.     Pursuant to Section 10.5 of the License Agreement, the termination of the License Agreement does not "release either Party from any obligation that matured prior to" termination. Section 10.5 also provides that the following sections of the License Agreement survive termination: SECTION 3 (with respect to Milestone Payments and Royalties accruing prior to expiration or termination), SECTION 4 (with respect to amounts accruing prior to expiration or termination), 6.2, 7.2 (with respect to any proceedings initiated prior to expiration or termination), 7.3, SECTION 8, 9.2, 10.5, and SECTION 11."

101.     Pre-contractual communications by Etnyre to Plaintiff are consistent with Plaintiff's reading of the executed License Agreement and constitute material representations regarding the status of the existing Voyager Tracker under the License Agreement.

102.     On April 8, 2019, Etnyre sent a marked-up draft of the license agreement to Needham and Oudheusden of FCX, as well as Bowman of FTC.  In his cover email, Etnyre wrote:  "Commercially, believe we are in step — one change made was a reduction of the first

100MW 'royalty free' sales — accounted for with milestone payments — to 66MW.  This was to clarify the language around what was or wasn't tied to effective date. ███████████████ ████████████████████████████████ so decrementing from 100 to 66 seemed the cleanest way to deal with the legal back and forth on language.  Keeps FCX whole."  A copy of the April 8, 2019 email is attached hereto as Exhibit I.

103.    Etnyre clearly stated that FTC's pre-License Agreement sales of the Voyager Tracker constituted sales of a Solar Tracker containing the Product under the terms of the License Agreement and that the Voyager Tracker was a covered product.

104.    Etnyre made this material representation of fact to Plaintiff for the purpose of inducing Plaintiff to perform under the Consulting Agreement.

### G.    FTC Makes and Sells Products As Defined in the License Agreement

105.    Since executing the Consulting Agreement and License Agreement, continuous to the present day, FTC has sold products that fall within Section 1.8 of the License Agreement.

106.    Since executing the Consulting Agreement and License Agreement, continuous to the present day, FTC has sold products that fall within Section 1.12 of the License Agreement.

107.    On information and belief, all damper-containing products made, used, sold, and offered for sale by FTC since the License Agreement was signed have been covered at least by the pending claims that had already been disclosed to FTC. Exhibit A at 27, 56–59.

108.    Plaintiff is unaware of a single damper-containing product sold or offered for sale by FTC during the pendency of the License Agreement that would not "infringe directly, indirectly by inducement of infringement, or indirectly by contributory infringement" Plaintiff's claim 1 as provided to FTC before execution of the License Agreement, "if such pending claim were issued." Ex. B Section 1.8; *see* Ex. A at 56.

109.    Each such product was sold for use with a collection of photovoltaic modules. Exhibit A at 56.

110.    Each such product included a base for supporting the collection of photovoltaic modules. *Id.*

111.    Each such product included a damper coupled between the collection of photovoltaic modules and the base that resists movement of the photovoltaic modules relative to the base. *Id.*

112.    Each such product's damper had a first damping ratio when the collection of photovoltaic modules moves at a first rate relative to the base and a second damping ratio when the collection of photovoltaic modules moves at a second rate relative to the base, such that the damper passively transitions from the first damping ratio to the second damping ratio. *Id.*

113.    FTC has performed dynamic modeling of its products evidencing this behavior in its dampers.

114.    Plaintiff is likewise unaware of a single damper-containing product sold or offered for sale by FTC during the pendency of the License Agreement that would not "infringe directly, indirectly by inducement of infringement, or indirectly by contributory infringement," Plaintiff's claim 12 as provided to FTC before execution of the License Agreement, "if such pending claim were issued." Ex. B Section 1.8; *see* Ex. A at 58.

115.    Each such product was sold for use with one or more photovoltaic modules. Ex. A at 58.

116.    Each such product included a base to be coupled to the photovoltaic modules for supporting the photovoltaic modules. *Id.*

117.    Each such product included a damper to be coupled between the collection of photovoltaic modules and the base that resists movement of the photovoltaic modules relative to the base. *Id*

118.    Each such product's damper had a first damping ratio when the collection of photovoltaic modules moves at a first rate relative to the base and a second damping ratio when the collection of photovoltaic modules moves at a second rate relative to the base, such that the damper passively transitions from the first damping ratio to the second damping ratio. *Id.*

119.    FTC has performed dynamic modeling of its products evidencing this behavior in its dampers.

120.    FTC's products are also covered by other claims pending in Plaintiff's family of patent applications on the day the License Agreement was signed.

121.    Plaintiff regularly informed FTC as to such patent filings.

122.    For example, FTC's products are covered by later claims in Plaintiff's family of patent applications, such as claims with dampers having "a damper piston movable through the fluid inside the damper chamber," where the piston includes "a first port," "a second port," and "a valve, configured to passively open or close the second port." *See* U.S. Patent Application No. 16/443,535, Amendment of 06/16/2020.

123.    Since July of 2020 or earlier FTC is believed to have used dampers with a first port, a second port, and a valve configured to passively open or close the second port.

124.    During the pendency of the license agreement, FTC thus sold damper-containing product that would "infringe directly, indirectly by inducement of infringement, or indirectly by contributory infringement," these pending claims, "if such pending claim[s] were issued." Ex. B Section 1.8.

**H.    FTC Initially Performs Under the License Agreement to Obtain Consulting Services of FCX**

125.    FTC initially performed under the License Agreement, paying Plaintiff license royalties as follows.

126.    For Q3 of 2019, FTC paid Plaintiff $158,145 in license royalties.

127.    For Q4 of 2019, FTC paid Plaintiff $380,580 in license royalties.

128.    For Q1 of 2020, FTC paid Plaintiff $320,318.28 in license royalties.

129.    For Q2 of 2020, FTC paid Plaintiff $610,350 in license royalties.

130.    FTC's paid royalties reflected FTC's correct understanding that its Voyager product, and any other damper-containing products, fell within Section 1.8 and Section 1.12 of the License Agreement from the day the License Agreement was signed.

131.    FTC's conduct was also consistent with its representation and warranty in Section 9.3 of the License Agreement that the Voyager was a "Solar Tracker" within the meaning of that agreement.

132.    FTC's license royalties—and pledged future royalties—also reflected the high value of Plaintiff's consulting services, as provided by Needham and Oudheusden.

133.    From May 13, 2019 through the present day, FTC has relied on Plaintiff's consulting services, knowhow, and intellectual property to refine FTC's products and thereby secure greater product sales.

134.    When the License Agreement was signed, FTC's products were suspected to be at high risk of failure in wind conditions.

135.    FTC thereafter began modifying its products in accordance with Plaintiff's guidance and intellectual property. Subsequent test results indicated that FTC's products, so modified, could satisfy project design wind speeds, although at a significant cost premium.

136.    FTC appreciated that its products would not be safe and viable unless Plaintiff could teach FTC to refine its products to meet exacting industry standards. To this end, Plaintiff was integral in advising and overseeing a second round of aeroelastic testing. Plaintiff worked extensively with FTC staff and external engineers to implement new methods to make FTC's projects code-compliant, resulting in increased FTC revenues in 2020. Plaintiff also taught further changes to the Voyager product lines that resulted in substantial increases in product reliability. These changes were implemented in early 2021.

137.    Plaintiff has performed at least 697 hours of work for FTC. During this time, Plaintiff was instrumental in solving time-sensitive product and project issues.

138.    Plaintiff first identified critical information that had not been previously evaluated in the Voyager product and spent significant time inventing and then implementing a method of modeling the behavior of the Voyager solar tracker under various wind loading scenarios.

139.    FTC used Plaintiff's modeling method to assure its customers that the Voyager system was safe.

140.    Plaintiff was also instrumental in the design and interpretation of aeroelastic tests FTC ran to further validate FTC's design.

141.    Plaintiff also proposed product changes to better implement Plaintiff's Core IP to reduce design loading and product costs significantly.  Without these product changes, FTC would not have achieved the project volumes it did in 2020 and 2021 and would not be able to achieve the project volumes it projects today.  It also may have found itself subject to liability to its existing customers for failing to deliver a solar tracker that met the required specifications, a potentially devastating blow to a growing startup.

142.    Plaintiff's engagement facilitated at least $100,000,000 in revenue to FTC.

143.    During the pendency of its consulting relationship with FTC, Plaintiff also forewent consulting opportunities with other clients, both because of the conflict posed by the ongoing engagement by FTC and because the time that Plaintiff spent on the FTC work prevented Plaintiff from taking on additional work.

### I.    FTC Stops Performing Under the License Agreement

144.    FTC failed to make a $60,000 milestone payment to Plaintiff within 30 days after the date that FTC first included a device design in the bill of materials for a Solar Tracker that can be quoted by or ordered commercially from FTC, as required by Section 3.1(b) of the License Agreement.  This payment should have been made no later than May 1, 2020.

145.    FTC failed to make a $75,000 milestone payment to Plaintiff within 30 days after the date that FTC first received a purchase order for the sale of a Solar Tracker, as required by Section 3.1(c) of the License Agreement.  This payment should have been made no later than May 1, 2020.

146.    On or about October 20, 2020, FTC transmitted the Q3 2020 Sales Report to Plaintiff.  The Q3 2020 Sales Report purported to deduct $243,000 in royalties that had been paid to Plaintiff in Q2 2020 in connection with a project ("Project A").

147.    In a phone call, Etnyre told Oudheusden that it was FTC's position that the royalty should not have been paid for Project A because the solar array installed in Project A added an ancillary mechanism to the tracker.

148.    FTC thereafter reiterated its belief that it was entitled to use Plaintiff's damper technology without paying a royalty under the License Agreement so long as the tracker also used an added mechanism.

149.    At no point did FTC represent that the tracker sold in Project A did not use Plaintiff's damper technology.

150.     The Project A royalties that FTC attempted to claw back on October 20, 2020 had been paid by FTC just six weeks earlier, on September 9, 2020.  At the time that FTC paid the Project A royalties to Plaintiff, FTC knew or should have known that the tracker sold in Project A contained an ancillary mechanism.

151.     FTC paid the Project A royalties to Plaintiff, with the undisclosed intent of subsequently contesting them, for the purpose of inducing Plaintiff to continue performing under the Consulting Agreement.

152.     Having failed to make required milestone payments and having staked out a position that it was entitled to continue utilizing Plaintiff's intellectual property without a license, FTC continued to walk away from its other obligations under the License Agreement.

153.     FTC failed to deliver Sales Reports to Plaintiff 30 days after the close of Q4 2020 and Q1 2021 as required in Section 4.1 of the License Agreement.

154.     These Sales Reports are necessary for Plaintiff to be able to calculate the royalties owed under the License Agreement and to know whether FTC has fully paid all such royalties.

155.     Even without such Sales Reports, it is beyond dispute that FTC has not paid the royalties due under the License Agreement because FTC has not paid any royalties whatsoever for Q3 2020, Q4 2020, Q1 2021, or Q2 2021.

156.     FTC's Q3 2020 Sales Report stated that FTC owes Plaintiff $547,350 in royalties for Q3 2020.

157.     The Q3 2020 Sales Report conceded that at least some of the Voyager Trackers sold by FTC during that quarter were "Solar Trackers" within the meaning of the License Agreement for which royalty payments were required.

158.     FTC made this implied statement to Plaintiff on or about October 20, 2020 for the purpose of inducing Plaintiff to continue performing under the Consulting Agreement.

159.     FTC has not paid Plaintiff any of the royalties identified in the Q3 2020 Sales Report.

160.     Based on FTC's public disclosures, FTC owes Plaintiff no less than a further $600,000 in royalties for Q4 2020 and $3,150,000 in royalties for 2021, although without the contractually required Sales Reports the total royalty amounts due cannot be determined with complete certainty.

161.     Pursuant to Section 3.5 of the License Agreement, FTC must also pay Plaintiff interest at a rate of 1.5% compounded monthly on the unpaid principal of each missed milestone and royalty payment.

162.     Based on market growth rates and success predictions consistent with FTC's public disclosures, projected sales of FTC's products through 2041 would result in over $100,000,000 in royalties due to Plaintiff.

163.     Despite FTC's bad faith attempts to profit off of Plaintiff's intellectual property without compensation, Plaintiff continued to perform under the Consulting Agreement.

**J.      FTC Further Repudiates the License Agreement**

164.     Having already made the claim that FTC was entitled to continue utilizing Plaintiff's damper technology without paying royalties on future projects so long as those future projects incorporate its ancillary mechanism, FTC went several steps further and claimed that—despite all evidence to the contrary—FTC had never utilized Plaintiff's intellectual property. This astonishing reversal, if taken seriously, would render many of FTC's past statements materially false and misleading.

165.    On December 23, 2020, Jacob Wolf, the general counsel of FTC, sent a letter to Plaintiff, attached hereto as Exhibit J with potentially confidential information of FTC redacted (the "December 2020 Letter").

166.    In the December 2020 Letter, FTC claimed that it had retained outside counsel to investigate whether it was required to pay Plaintiff, among other things, the royalties that FTC had already identified in the Q3 2020 Sales Report as due and owing to Plaintiff.

167.    According to FTC, its outside counsel concluded that FTC "has not incorporated dampers that would infringe any issued claim of the '231 patent or '097 patent into any of its Voyager Tracker systems, and, accordingly, does not owe FCX any milestone, royalty, or late payments." Exhibit J at 1.

168.    FTC further suggested that Plaintiff should return the more than $1.4 million in royalty payments that FTC had already voluntarily paid to Plaintiff, on the basis of Sales Reports provided by FTC. *Id.* at 1-2.

169.    For the reasons stated in Paragraphs 81 to 85 and 105 to 124 of this Complaint, FTC's claim is entirely baseless.

170.    FTC's outside counsel cannot have had greater insight than FTC's executives and engineers regarding the intellectual property utilized by the Voyager Tracker.

171.    At the time that FTC was negotiating the License Agreement and Consulting Agreement with Plaintiff, FTC knew that the Voyager Tracker utilized Plaintiff's intellectual property.  FTC accordingly represented and warranted that the Voyager Tracker was a Solar Tracker as that term is defined in the License Agreement.

172.    As FTC worked closely with Plaintiff for nearly two years to develop and refine the Voyager Tracker, FTC knew that it was incorporating FCX intellectual property and FCX improvements into that design.

173.    If FTC is correct that the Voyager Tracker never utilized Plaintiff's intellectual property, it must follow that FTC has been engaged in a multi-year campaign of deceit against Plaintiff.

174.    If FTC is correct that the Voyager Tracker never utilized Plaintiff's intellectual property, then Etnyre's October 19, 2018 statement that FTC was "largely in alignment with the summary below," which summary stated that FTC and Plaintiff "agreed that overlap [of intellectual property] existed" between Plaintiff and the Voyager Tracker design, was materially false or misleading.  FTC's omission to offer any correction to Plaintiff's summary, despite Oudheusden's request to "please let [Plaintiff] know" if FTC finds "any detail to be inaccurately stated or if there are details [FTC would] like included," was similarly materially false or misleading.

175.    If FTC is correct that the Voyager Tracker never utilized Plaintiff's intellectual property, then each of the Q3 2019, Q4 2019, Q1 2020, Q2 2020, and Q3 2020 Sales Reports was materially false or misleading.

176.    If FTC is correct that the Voyager Tracker never utilized Plaintiff's intellectual property, then FTC made materially false or misleading statements, to induce Plaintiff into entering the Consulting Agreement and agreeing to provide cut-rate consulting services to FTC, and thereafter to induce Plaintiff to continue providing these services.

177.    Had FTC at any time shown that it believed Voyager was not a Product or a Solar Tracker within the definition of the License Agreement, or had FTC at any time shown that it did

not intend to make any royalty payments or milestone payments under the License Agreement on

Voyager, Plaintiff would not have entered into the Consulting Agreement and would not have

provided FTC with nearly 700 hours of consulting services directed to Voyager.

**K.     FTC Terminates the License Agreement**

178.    On April 30, 2021, after this Action was filed, FTC notified Plaintiff of its

exercise of the right to terminate the License Agreement upon 30 days' notice.  The License

Agreement terminated on May 30, 2021.

179.    Pursuant to Section 10.5(b) of the License Agreement, Plaintiff demanded that

FTC tender payment of all accrued Royalties and other payments due to Plaintiff within 30 days

of termination.  FTC failed to tender the payment owed.

180.    Section 3.5 of the License Agreement requires FTC to "promptly pay all of

[Plaintiff's] costs and expenses of collection for any Fees that are not timely paid, including any

attorneys' fees or other costs or expenses of collection." Section 3.5 expressly survives the

termination of the License Agreement.

181.    Effective May 30, 2021, all licenses by Plaintiff to FTC ceased.

182.    FTC continued to sell Voyager Trackers utilizing Plaintiff's intellectual property

following the termination of the License Agreement.  Such sales are the subject of a separate

patent infringement action filed by Plaintiff against FTC.

**First Claim for Relief**
**(Breach of Contract)**

183.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 182.

184.    The License Agreement was a contract between Plaintiff and FTC.  Plaintiff

performed under the License Agreement by granting the license.

185.    FTC breached its obligations under the License Agreement by failing to timely pay required milestone payments, royalty payments, late payments, and Plaintiff's costs and expenses of collection for fees that were not timely paid.

186.    In its December 23, 2020 letter, FTC also breached its representation and warranty that the Voyager Tracker was a Solar Tracker as that term is defined in the License Agreement.

187.    As a result of FTC's breaches, Plaintiff is owed, and has suffered damages, in an amount to be determined at trial.

**Second Claim for Relief**
**(Fraud)**

188.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 187.

189.    Etnyre and FTC represented to Plaintiff on September 26, 2018 and again on October 19, 2018 that FTC agreed with Plaintiff that the Voyager Tracker design used intellectual property that overlapped with the intellectual property previously disclosed by Plaintiff to FTC, and that FTC would require a license in order to continue using the design.

190.    This statement was materially false or misleading if, as follows from the statements in FTC's December 23, 2020 letter, at the time that the statement was made FTC maintained a secret belief that the Voyager Tracker did not utilize any infringing intellectual property and that FTC could continue to produce and sell the Voyager Tracker without a license.

191.    Etnyre and FTC knew that these statements were false at the time that they were made.

192.    Etnyre and FTC made these statements for the purpose of inducing Plaintiff to enter into the Consulting Agreement and intended Plaintiff to rely upon them.  FTC wanted to obtain the benefits of Plaintiff's consulting services without providing adequate compensation.

193.   Plaintiff justifiably relied upon Etnyre and FTC's false statements in agreeing to the Consulting Agreement, including its cut-rate hourly fees.  Plaintiff, through the exercise of due diligence, could not have learned about the falsity of FTC's statements regarding FTC's secretly held belief prior to entering into the Consulting Agreement.

194.   Plaintiff continued to rely on FTC's false statements in continuing to provide consulting services for more than one year after execution of the Consulting Agreement at the same fees.  Plaintiff, through the exercise of due diligence, could not have learned about the falsity of FTC's statements regarding FTC's secretly held belief at any time during the period that FCX provided its consulting services to FTC.

195.   As a result of FTC's false statements, Plaintiff is owed, and has suffered damages, in an amount to be determined at trial.

196.   Plaintiff is owed no less than the value of Plaintiff's lost opportunity to apply its consulting services to other clients.

197.   Plaintiff is further owed no less than the value of the improvements that Plaintiff's labor has provided, and is expected to provide, to FTC's products and sales.

### Third Claim for Relief
### (Unjust Enrichment)

198.   Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 197.

199.   FTC was enriched by Plaintiff's provision of consulting services.  Its revenues were substantially enhanced as a direct result of the intellectual property and know-how contributed by Plaintiff.

200.   FTC's enrichment was at Plaintiff's expense.  Plaintiff at all times understood, and believed that FTC agreed, that Plaintiff's primary compensation for the consulting services delivered under the Consulting Agreement would come from royalties under the License

Agreement.  Plaintiff would not have entered into the Consulting Agreement and provided FTC with nearly 700 hours of consulting services at a grossly inadequate hourly rate if Plaintiff had been aware that FTC intended to repudiate the License Agreement.  Rather, Plaintiff would only have entered into a consulting agreement under Plaintiff's typical fee structure of a percentage of costs saved or value added on a per-sale or per-watt basis, or for an equity interest in FTC itself.

201.    The value of the benefits that Plaintiff conferred upon FTC far exceed FTC's payment under the Consulting Agreement alone.  If FTC is correct that the License Agreement was never required and that it does not owe Plaintiff any money under the License Agreement, then it would be grossly unjust and inequitable to allow FTC to retain the value of Plaintiff's consulting services without providing adequate compensation.

202.    The inequity arises from FTC's asymmetric knowledge of its technology and its plans for the future.  FTC either knew or should have known that it did not intend to sell products that fell under the License Agreement.

203.    FTC has thus been unjustly enriched, and Plaintiff is owed, and has suffered damages, in an amount to be determined at trial.

204.    Plaintiff is owed no less than the true value of the consulting services that it provided to FTC which may be measured, among other ways, by the value of the improvements that Plaintiff's labor has provided, and is expected to provide, to FTC's products and sales.

205.    Alternatively, the true value of the consulting services that FCX provided to FTC may be measured as a portion of the current market value of the company that FCX helped FTC to become.


**Prayer for Relief**

WHEREFORE, Plaintiff requests the entry of judgment against Defendant as follows:

(a)   Awarding Plaintiff damages in an amount to be determined at trial, but no less than $133,818,129 together with pre-judgment interest and post-judgment interest, as applicable;

(b)   Awarding Plaintiff its costs and expenses of collection for all unpaid milestone payments and royalty payments, including but not limited to Plaintiff's attorneys' fees; and

(c)   Granting Plaintiff such other legal and equitable relief as the Court deems just and proper.

Dated: July 16, 2021                    Respectfully submitted,

                                        **PERKINS COIE LLP**

                                        <u>*/s/ Matthew J. Moffa*</u>
                                        Gene W. Lee
                                        Matthew J. Moffa
                                        Andrew Podolin
                                        Jacob Taber
                                        PERKINS COIE LLP
                                        1155 Avenue of the Americas, 22nd Floor
                                        New York, NY 10036-2711
                                        Telephone: (212) 261-6857
                                        Fax: (212) 399-8057
                                        e-mail: MMoffa@PerkinsCoie.com

                                        Brian Coleman (*pro hac vice* forthcoming)
                                        James F. Valentine (*pro hac vice* forthcoming)
                                        PERKINS COIE LLP
                                        3150 Porter Drive
                                        Palo Alto, CA  94304-1212
                                        Telephone: (650) 838-4300
                                        Fax: (650) 838-4350
                                        e-mail: BColeman@PerkinsCoie.com

                                        *Counsel for Plaintiff FCX Solar, LLC*