USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 02/07/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FCX SOLAR, LLC,

                Plaintiff,

        v.

FTC SOLAR, INC.,

                Defendant.

No. 21-CV-3556 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

On July 16, 2021, Plaintiff filed its First Amended Complaint asserting breach of contract, fraud, and unjust enrichment. Defendant now moves for a partial motion to dismiss Plaintiff's fraud and unjust enrichment claims. For the reasons that follow, the motion is granted.[1]

## BACKGROUND

The following facts are drawn from Plaintiff's First Amended Complaint ("Compl.") and attached exhibits and are assumed to be true for the purpose of resolving this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017). Plaintiff FCX Solar, LLC ("FCX") is an engineering consultancy and green technology firm that develops intellectual property and provides its engineering services to other solar power developers. Defendant FTC Solar, Inc. ("FTC") develops and provides solar tracker systems to utilities and other large solar power producers. A solar tracker system "allows a photovoltaic cell to track the movement of the sun through the sky over the course of a day, increasing the efficiency and output of a solar array." Compl. ¶ 3.

---

[1] Initially, Defendant also moved for a more definite statement with respect to the breach of contract claim. At oral argument, however, the parties agreed to resolve this issue by allowing Defendant to serve limited interrogatories in order to narrow the focus of the breach of contract claim. In light of that agreement, this aspect of the motion is now deemed moot.

### I.     The Parties' Initial Relationship

The parties' relationship first began in September of 2017, when the sole members of FCX, Christopher Needham and Frank Oudheusden, met with FTC executives at the Solar Power International Conference in Las Vegas, Nevada. As a result of this meeting, "FTC retained Plaintiff for a narrow and time-limited consulting engagement" to help evaluate the market for solar trackers and provide analysis on one of FCX's solar tracker models. Compl. ¶ 5; *see also id.* ¶ 29–30. As part of this arrangement, the parties signed a nondisclosure agreement. Compl. Ex. C. Under the protection of this nondisclosure agreement, Plaintiff shared some of its intellectual property concerning a "passive load-sharing damper" in an effort to see whether Defendant was interested in developing a further business relationship with it. This type of damper technology allows a solar tracker to withstand heavy winds by absorbing wind vibration, and as a result, provides solar tracker manufacturers significant cost-savings by reducing steel costs. Compl. ¶¶ 4, 31, 36. The parties did not enter into any other agreements at that time.

### II.    The Parties Enter into the Consulting and License Agreements

One year later, in September of 2018, both parties attended the 2018 Solar Panel International Conference in California. FTC hosted a booth at the conference, where it featured a prototype of a new solar tracker called the "FTC Voyager Tracker." Needham and Oudheusden visited Defendant FTC's booth, and upon viewing the Voyager Tracker, recognized that it seemed to use Plaintiff FCX's damper design—the same intellectual property that it had shared with FTC a year earlier under the protection of the nondisclosure agreement. Oudheusden and Needham then approached FTC executives, including CEO Anthony Etnyre, to voice their concerns that FTC was using FCX's protected intellectual property without a license. The parties held a meeting later that day, a summary of which was memorialized by Oudheusden in an email sent to Etnyre

2

and Mitch Bowman, FTC's director of engineering. *See* Compl. Ex. D at 3. In that email, Oudheusden states that, "[d]uring the course of [the initial discussions between FCX and FTC regarding the Voyager Tracker,] it was discovered that vital design features had a possible overlap with FCX intellectual property, which was disclosed to FTC. Those concerns were politely voiced and another meeting for later that day (4:30 pm) was set for discussion." *Id.* After FCX had raised its concerns, Oudheusden explained that FTC "researched . . . their design process, timeline and technology with the broader FTC team and discovered that they had inadvertently overlapped Voyager design features with FCX IP. The intent of the overlap was unintentional, both parties (FTC and FCX) agreed that overlap existed and that a viable licensed solution could be reached amicably." *Id.* During this meeting, the parties agreed that "FTC would enter into a licensing agreement with Plaintiff after all, as well as a consulting agreement so that Plaintiff could assist FTC with integrating Plaintiff's damper technology." Compl. ¶ 7. In responding to Oudheusden's email, Etnyre confirmed that "[w]e are largely in alignment with the summary below," and proposed the terms of a license agreement. Compl. Ex. D at 1.

Over the next few months, the parties engaged in negotiations over the terms of the potential license and consulting agreements. As part of these negotiations, the parties discussed several different fee structures for potential inclusion in the proposed license agreement. One possible fee structure was to award Plaintiff a percentage of the cost savings that FTC achieved through using Plaintiff's intellectual property against the baseline cost. FTC's Mitch Bowman expressed concerns with this fee structure: "My only concern is the 'COGS [cost of goods sold] with no IP overlap' baseline? To really flush this out, we'd basically need to design and price a new product that will never be sold. We cannot afford to allocate already overloaded teams time to this exercise." Compl. Ex. E. In other words, Bowman felt that it would not be worth FCX's

resources to create a baseline solar tracker that did *not* contain any of Plaintiff's intellectual property since such a product did not already exist and would never be sold.

Following negotiation of the terms of the potential license and consulting agreements, the parties eventually reached an oral agreement that Plaintiff memorialized in a non-binding Term Sheet. Compl. ¶ 52; Ex. G. On April 6, 2019, the parties entered into a year-long Consulting Agreement, in which Plaintiff agreed to provide FTC with consulting services regarding the "continued development of the Voyager single-axis tracker platform." Compl. Ex. A. Pursuant to the Consulting Agreement, Plaintiff was to receive $190.00 per hour of work per individual (plus reimbursement of reasonable expenses). *Id.* Plaintiffs allege that the only reason why Oudheusden and Needham agreed to this "low hourly rate" was because they understood that they would primarily be compensated through royalty payments under the proposed License Agreement. Compl. ¶ 62.

Several weeks later, on May 13, 2019, the parties entered into the License Agreement. Compl. Ex. B. Plaintiff asserts that some of the delay in signing the License Agreement was due to FCX's "procrastination" failing to provide comments in a timely fashion. Compl. ¶ 70. In an email from Oudheusden to Etnyre inquiring about when FTC planned to execute the License Agreement, Oudheusden wrote that "Chris [Needham] and I would like to get to work on Voyager improvements." Compl. Ex. H. Plaintiff asserts that this statement helps show that the parties understood the License and Consulting Agreements to be part of the same deal, since Plaintiff was not going to begin providing consulting work until the License Agreement was also executed. Compl. ¶ 73.

Under the License Agreement, Plaintiff granted FTC a royalty-bearing license that, among other things, allowed FTC to "make Products and to sell and use Products incorporated into Solar Trackers." *Id.* ¶ 75.  The License Agreement defines "Product" to mean,

> on a country-by-country basis, any product the making, using, selling, offering for sale, importing or exporting in the country in question would (without the license granted hereunder) infringe directly, indirectly by inducement of infringement, or indirectly by contributory infringement, at least one issued Valid Claim or any pending Patent claim that would be hypothetically infringed if such pending claim were issued in its then pending state, in such country.

Compl. Ex. B § 1.8.

The agreement further defines a "Valid Claim" to mean "(a) a claim of an issued and unexpired Patent that has not been abandoned, revoked, or held unenforceable or invalid in a decision from which an appeal cannot be taken; or (b) any claim in any pending application for a Patent that was filed in good faith and has not been cancelled, withdrawn, abandoned, or finally disallowed without the possibility of appeal or refiling of such application and has not been pending for more than five years." *Id.* § 1.13.  Finally, the License Agreement defines "Solar Tracker" to mean a "device, installed at grade, incorporating the Product that uses a single-axis for orienting Solar Panels." *Id.* § 1.12.  Plaintiff asserts that FTC's Voyager Tracker was covered by these claims on the day that the License Agreement was signed and continues to be at all times since then.

### III. Milestone and Royalty Payments

Pursuant to the License Agreement, Defendant was to compensate Plaintiff through both milestone and royalty payments.  Specifically, FTC was required to make the following milestone payments:

> (a) $15,000 due within 30 days of the effective date; (b) $60,000 due within 30 days of FTC first including a device design in the bill of materials for a Solar Tracker than can be quoted by or ordered commercially from FTC or an affiliate; (c)

5

    $75,000 due within thirty days after FTC receives the first purchase order for the sale of a Solar Tracker; and (d) $50,000 due within 30 days after the first Patent issues with a Valid Claim covering a device or process for use in or with a Solar Tracker.

Compl. ¶ 91; *see also* Compl. Ex. B § 3.1

    The License Agreement also required FTC to pay royalties of "$0.0015 per watt (direct current) for the first two 'cumulative gigawatts of the designed DC output wattage of Solar Panels designed to be controlled by any Solar Tracker Sold by' FTC or an affiliate." Compl. ¶ 92; *see also* Compl. Ex. B § 3.2. If $3 million in royalties were paid, the royalty per watt of output wattage would decline to "$0.00125 for the third cumulative gigawatt and $0.0010 per watt for watts in excess of the third cumulative gigawatt." Compl. ¶ 93. Any royalties due were to be paid by FTC within thirty days after the end of each calendar quarter. Plaintiff asserts that FTC represented and warranted that the Voyager Tracker was a Solar Tracker and contained a covered Product for which these royalty payments would be owed. Finally, the License Agreement granted Plaintiff the option to terminate the agreement early if the royalties fell below a specific minimum amount, unless FTC made shortfall payments to satisfy the difference. Compl. Ex. B § 3.3(a).

    Initially, the parties proceeded amicably as FTC began paying Plaintiff royalties under the License Agreement. Specifically, FTC paid Plaintiff $158,145 in royalties for Q3 of 2019, $380,580 for Q4 of 2019, $320,318.28 for Q1 of 2020, and $610,350 for Q2 of 2020. Compl. ¶¶ 126–29. However, the relationship took a turn when May 1, 2020 passed and FTC had not paid Plaintiff what Plaintiff understood to be its first two required milestone payments of $60,000 and $75,000. *Id.* ¶¶ 144–45. Then, in its Q3 2020 Sales Report transmitted to FCX, FTC deducted $243,000 in royalties that had previously been paid to Plaintiff in Q2 2020 in connection with "Project A." FTC's purported reason for doing so was because the solar array used in Project A added an ancillary mechanism to the tracker, and so FTC did not believe that royalties should have

been paid for it. At no point did FTC argue that Project A did not utilize Plaintiff's damper technology. At this point, Defendant stopped paying Plaintiff any royalties. Plaintiff asserts that Defendant owes it $547,350 in unpaid royalties for Q3 2020. *Id.* ¶ 156. Defendant also stopped delivering sales reports to Plaintiff within thirty days of the close of each quarter, leading Plaintiff to estimate what it understands the royalties it is owed based on public disclosures. Plaintiff estimates that, in addition to the missed milestone payments and Q3 2020 unpaid royalties, Defendant owes at least $600,000 in royalties for Q4 2020 and $3,150,000 in royalties for Q1 and Q2 2021, plus interest. *Id.* ¶¶ 153, 160–61.

In December of 2020, after Plaintiff sent a letter to Defendant articulating its position on royalty payments, FTC's General Counsel, Jacob Wolf, responded with a letter explaining that FTC had retained outside counsel to investigate whether FTC owed FCX any royalties. Compl. Ex. J. The outside counsel, Wolf explained, had determined that FTC "has not incorporated dampers that would infringe any issued claim of the '231 patent or '097 patent into any of its Voyager Tracker systems, and accordingly, does not owe FCX any milestone, royalty, or late payments." *Id.* at 1. Further, Wolf wrote that "FTC's dampers have at all times been, and continue to be, noninfringing." *Id.* In addition to asserting its position, FTC also suggested that the royalty payments that it had already paid, amounting to more than $1.4 million, "may have been made in error." *Id.*

Plaintiff filed this action on April 21, 2021 asserting breach of the License Agreement, fraudulent inducement of the Consulting Agreement, and unjust enrichment. The parties thereafter terminated the License Agreement on May 30, 2021, and Plaintiff sued Defendant in a patent infringement action in the U.S. District Court for the Western District of Texas. That case has

since been transferred to the Southern District of New York and has been consolidated with the instant matter.

Defendant now seeks the dismissal of Plaintiff's fraud and unjust enrichment claims. For the reasons that follow, the Court grants Defendant's partial motion to dismiss.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011). In answering this question, the Court must "accept[ ] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

## DISCUSSION

### I. Fraudulent Inducement of the Consulting Agreement

As a preliminary matter, the parties dispute which state's law should apply to Plaintiff's fraud claim. Defendant argues that New York law should apply, whereas Plaintiff argues that

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

8

Delaware law should apply because the Consulting Agreement contains a Delaware choice-of-law provision. Compl. Ex. A § 10.7; *see also* Def.'s Br. at 9.

"[U]nder New York law . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract." *Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 335 (2d Cir. 2005); *see also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("While a choice-of-law provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort."). Applying New York's choice-of law analysis for tort claims, the Court must next consider whether an actual conflict exists between the state laws that are implicated. *Finance One*, 414 F.3d at 331. If a conflict does exist, the Court must apply the law of the state with the greatest interest in the litigation. *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006).

The Court finds that there is no actual conflict between New York and Delaware fraud claims.[3] Since there is no conflict, the Court will apply New York law. *See Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference, . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.").

"To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5)

---

[3] To state a claim for fraud under Delaware law, the plaintiff must adequately allege that "(1) the defendant[] falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant[] knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant[] intended to induce the plaintiff to act or refrain from acting; (4) plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207 (Del. Ch. 2006). New York law, as described below, requires that the same five general elements be met. At oral argument, Plaintiff's counsel conceded that there is no actual conflict between the elements of a fraud claim under Delaware and New York law and did not identify any difference in how they are applied by courts in each of the respective jurisdictions.

9

which caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402 (2d Cir. 2015). Federal Rule of Civil Procedure 9(b) sets forth a heightened pleading standard for allegations of fraud: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In order to satisfy Rule 9(b)'s standard, the Second Circuit has said that a complaint must "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* But since the court "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding the condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations,' . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

Defendant argues that Plaintiff fails to plead the elements of fraud with the specificity required under New York law. Def.'s Br. at 9. Plaintiff contends that Defendant falsely asserted that

> (i) FTC understood that the Voyager solar tracker utilized Plaintiff's intellectual property; (ii) FTC presently intended to enter into a license agreement which would compensate Plaintiff proportionately to sales of Voyager solar trackers; and (iii) FTC presently intended to make royalty payments to Plaintiff indefinitely in connection with the sales of Voyager solar trackers and any other solar trackers utilizing Plaintiff's intellectual property, including but not limited to Plaintiff's passive load-sharing damper design.

Pl.'s Br. at 12.

To support its argument, Plaintiff points to Oudheusden's email to Etnyre citing "overlap" between FTC's Voyager tracker and Plaintiff's intellectual property, and Etnyre's response that

10

FTC was "largely in alignment" with FCX's meeting summary. Compl. §§ 43–45. According to Plaintiff, FTC's "statements were false when made because FTC had already hatched the scheme that it executed in December 2020—that it planned to assert that the Voyager solar tracker did not utilize Plaintiff's intellectual property." *Id.* Plaintiff argues that Defendant made these representations with the intent to defraud it by knowing that it would cause Plaintiff to enter into the Consulting Agreement, and Plaintiff relied on these misrepresentations when it entered into the Consulting Agreement because it was under the impression that it would receive the majority of its compensation through royalties from the License Agreement.

Defendant contests whether FTC's statement that it was "largely in alignment" with Plaintiff's claim of "overlap" is an actionable misrepresentation. It next argues that FCX's theory requires interpreting FTC's statement of "alignment" as the equivalent of an admission of patent infringement, but that even if the overlap statement could be understood as "infringement," "it is Plaintiff's burden to plead why FTC's 2018 statement about 'overlap' was false when it was made." Def.'s Br. at 11.

The Court finds that Plaintiff's allegations fail to meet the heightened pleading standard for fraud because they have not sufficiently alleged that FTC's statements were knowingly false when made. Plaintiff alleges that these statements were false or misleading "if Defendant maintained a secret belief that the Voyager Tracker did not utilize any infringing intellectual property and that FTC could continue to produce and sell the Voyager Tracker without a license." Compl. ¶ 90.

Plaintiff has not pled sufficient facts to plausibly allege that Defendant knew these statements to be false at the time they were made. The only fact that Plaintiff asserts in support of the notion that Defendant harbored a "secret belief" that the Voyager Tracker did not use Plaintiff's

11

intellectual property is the December 2020 email describing Defendant's change in position and stating that "FTC's dampers have at all times been, and continue to be, noninfringing." Compl. Ex. J. at 1. But Plaintiff's First Amended Complaint includes no facts that suggest this was anything other than a shift in position. For example, Plaintiff alleges no facts suggesting that Defendant believed in 2018 that the Voyager Tracker did not utilize Plaintiff's intellectual property and that it was lying to try to induce Plaintiff into agreeing to the Consulting Agreement at a low rate.

Indeed, all of the facts asserted seem to suggest just the opposite—that there seemed to be a shared understanding between the parties that Defendant's Voyager Tracker incorporated at least some of Plaintiff's intellectual property and that, because of this overlap, the parties entered into the License Agreement and Consulting Agreement so that Defendant could continue to use this damper technology and perform under the License Agreement. Plaintiff's argument is belied, for instance, by the fact that Defendant made approximately $1.4 million in royalty payments to Plaintiff between May 2019 and May 2020. Compl. ¶¶ 126–29. This is further bolstered by Mitch Bowman's email to FCX that stated that a form of the tracker that did not include Plaintiff's intellectual property did not exist. Compl. ¶ 49; Ex. E. Even accepting all of Plaintiff's facts as true and drawing all reasonable inferences in Plaintiff's favor, as the Court is required to do at this stage, Plaintiff has not sufficiently alleged that these are more than "speculation and conclusory allegations." *Acito*, 47 F.3d at 52.

Because Plaintiff has not adequately alleged "a material misrepresentation or omission of fact . . . which the defendant knew to be false," *Fin. Guar. Ins. Co.*, 783 F.3d at 402, the Court grants Defendant's motion to dismiss Plaintiff's fraud claim.[4]

## II.      Unjust Enrichment

Plaintiff next asserts that FTC was unjustly enriched by FCX's provision of consulting services at Plaintiff's expense because Plaintiff believed that its primary payment would come from the royalties paid under the License Agreement and it would not have entered into the Consulting Agreement at such a low rate if not for the License Agreement. If Defendant is correct that the License Agreement was never required and that it does not have to pay Plaintiff any royalties, then, Plaintiff argues, Defendant was unjustly enriched and it would be inequitable to allow Defendant to retain the value of Plaintiff's consulting services received.

As an initial matter, the parties once again dispute whether New York or Delaware law should apply to Plaintiff's unjust enrichment claim. Although the Consulting Agreement is controlled by Delaware law, "unjust enrichment is an equitable claim that is outside the scope of the contract's choice-of-law provision and may be governed by the law of a different state." *Xiotech Corp. v. Express Data Prod. Corp.*, 11 F. Supp. 3d 225, 241–42 (N.D.N.Y. 2014); *Gross Fdn., Inc. v. Goldner,* No. 12 Civ. 1496, 2012 WL 6021441, *11 (E.D.N.Y. Dec. 4, 2012). In this context, as described above, choice of law only comes into play if "the laws of competing jurisdictions are actually in conflict." *IBM*, 363 F.3d at 143. There is no material difference between common law unjust enrichment claims in New York and Delaware. *See McBeth v. Porges*, 171 F. Supp. 3d 216, 224 (S.D.N.Y. 2016). Therefore, "[b]ecause plaintiff's equitable

---

[4] In light of the fact that the Court finds Plaintiff to have failed to adequately allege a false representation of fact, it need not address whether the alleged statements constitute "non-actionable legal opinions" or whether Plaintiff's fraud claim is duplicative of its breach of contract claim.

13

claims, like its fraud claims, are outside the scope of the [Consulting] Agreement's choice-of-law provision, New York law applies." *Xiotech Corp.*, 11 F. Supp. 3d at 241–42.

To assert a viable claim for unjust enrichment under New York law, a claimant must allege facts establishing: "(1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). A cause of action for unjust enrichment under New York law cannot stand where there is a valid contract governing the same subject matter between the parties. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). "Courts have permitted pleading in the alternative in the face of a written agreement, however, when there is a dispute as to the agreement's validity or enforceability." *Air Atlanta Aero Engineering Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 195 (S.D.N.Y. 2009).

Defendant urges the Court to dismiss Plaintiff's unjust enrichment claim because the License and Consulting Agreements are "two, valid written contracts [that] govern the subject matter of Plaintiff's claim." Def.'s Br. at 20. Despite the existence of the two contracts, Plaintiff argues that its unjust enrichment claim survives for three independent reasons. First, Plaintiff argues that its unjust enrichment applies because the Consulting Agreement was void or voidable because it was fraudulently induced. Pl.'s Br. at 22–23. Second, Plaintiff argues that the Consulting Agreement itself was the unjust enrichment, and so a claim for unjust enrichment can stand.[5] Third, Plaintiff argues that, in the "unlikely event" that FTC's representations about its Voyager Tracker were the result of a mistake, then the Consulting Agreement is void under the

---

[5] To support this argument, Plaintiff relies on Delaware law, citing *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018) (denying motion to dismiss unjust enrichment claim where plaintiff alleged that it never would have entered into contract but for defendant's fraud). It is not clear whether Plaintiff believes this argument similarly applies under New York law, but, in any event, this argument fails for the reasons that follow.

doctrines of mutual mistake and innocent misrepresentation. Pl.'s Br. at 23–24. Each of these arguments fail.

As an initial matter, Plaintiff's first two unjust enrichment theories are dependent on the survival of the fraud claim. Because the Court declines to find that the Consulting Agreement was fraudulently induced, the unjust enrichment claim cannot be maintained on the basis of these two theories. Plaintiff's third theory, relying on mutual mistake, is also unpersuasive. Plaintiff has not alleged any facts in its complaint to support the theory that Defendant's representations were mistakes—to the contrary, Plaintiff alleges that Defendant held a secret belief that the Voyager Tracker did not contain Plaintiff's intellectual property and purposely lied to Plaintiff in inducing it into signing the Consulting Agreement with no intention of ever paying them royalties under the License Agreement.

Because the Court finds Plaintiff's arguments that the Consulting Agreement was not a valid contract insufficient, a claim for unjust enrichment, which sounds in quasi-contract, cannot apply.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's fraud and unjust enrichment claims is granted. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 12.

Dated:   February 7, 2022
         New York, New York

_____
Ronnie Abrams
United States District Judge